UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| Carolyn Cole, | ) | Civil Action No: |
|       Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| Gerald V. Montgomery, | ) | |
| Carolina Health Care Services, | ) | |
| East Coast Protective Services, | ) | |
| Southeast Protecton Services, | ) | |
| Southeast Airport Services, | ) | |
| Thomas Behan, | ) | |
| The Montgomery-Davis Group, | ) | |
| The Montgomery Davis Group Properties, | ) | |
| Rhonda Montgomery Davis, | ) | |
| Stanley Montgomery, | ) | |
| Oasis Mortgage, | ) | |
| James Penniegraft, | ) | |
| JoAnn Penniegraft Cheek, | ) | |
| Mark Randolph, Esq., | ) | |
| Jennifer Dalton Watson, | ) | |
| Option One Mortgage, | ) | |
| Southeastern Title Agency, LLC, | ) | |
| Stewart Title Guaranty Company, | ) | |
| RBC Centura Bank, | ) | |
| Investors Title Insurance Company, | ) | |
| Duane Bryant, Esq., | ) | |
| J. Rufus Farrior, Esq., | ) | |
| Litton Loan Servicing, | ) | |
| Washington Mutual Bank, | ) | |
| Chase Bank, | ) | |
| Armina Swittenberg, aka, Swittenberg and Associates, | ) | |
| Argent Mortgage, | ) | |
| Commonwealth Land Title Insurance Company, | ) | |
| Attorney's Title Company (Div. of United General Tire), | ) | |
| East Coast Hospitality Staffing, | ) | |
| Vernessa Pertell, | ) | |
| Town of Atlantic Beach, | ) | |
| Jake Evans, | ) | |
| Josephine Isom, | ) | |
| Charlene Taylor, | ) | |

1

Joe Montgomery,                                              )
William Booker,                                              )
Christopher Clagg,                                           )
Charles Williams,                                           )
Tracy Edge,                                                  )
Municipal Association of South Carolina,                    )
State Ethics Commission of South Carolina,                  )
Herbert Hayden,                                              )
Jim Bagnall                                                  )
                                        Defendants.    )
                                                             )
_____ )

## PARTIES

1.  Plaintiff, Carolyn Cole is the former wife of Defendant Gerald V. Montgomery.  She
    filed for divorce in June 2006.  The divorce was granted in a bifurcated process in
    April 2009.  The division of assets is still pending before the Florida Court.

2.  Defendant Gerald Montgomery is the former husband of Plaintiff Carolyn Cole.  He
    resigned from UPS in 2007.  He was employed by Marriott Resorts Hospitality
    Corporation in 2010 and worked for Seaworld Orlando in 2011.    Southeast
    Protection Services is licensed in Florida. He opened Southeast Airport Services in
    Florida in February 2013.  He is also listed on some mortgage loan documents as a
    realtor for the Montgomery-Davis Group.   Other affiliated businesses include Metro
    Atlanta Janitorial in Marietta, Georgia, Coffee at the Summit, Montgomery's 623,
    and Montgomery's 6 and 9 in Greensboro, North Carolina.

3.  Defendant Carolina Health Care Services is a North Carolina corporation registered
    by Defendant Gerald Montgomery and Donald Booker with the Department of the
    Secretary of State on September 30, 2009.  The corporation was administratively
    dissolved on August 20, 2012 for failure to file an annual report.

4.  Defendant East Coast Protective Services is a corporation registered with the North
    Carolina Department of the Secretary of State with an effective date of February 23,
    2010.  The agent and President is Defendant Gerald V. Montgomery with office
    addresses at 130 E. Fisher Avenue, Greensboro, North Carolina and 623 Summit
    Avenue, Greensboro, North Carolina.  The company is also registered with the South
    Carolina Secretary of State as of October 20, 2010.  The registered agent is O. Cyrus

Hinton, 235 E. Main Street, Suite 110, Rock Hill, South Carolina. The Application by Foreign Corporation for Authorization to Transact Business in Florida was filed on January 7, 2011 and contains a description of the business as "security guard patrol, private investigation service. The alternate corporate name in Florida is Southeast Protection Services, Inc. The registered agent is Tony Burkhalter at 15300 Pebble Ridge Street in Winter Garden, Florida. The principal address is 623 Summit Avenue in Greensboro, North Carolina. East Coast Protective Services is also a foreign corporation registered with the Georgia Secretary of State on April 26, 2011. The registered agent is Tawana Howell at 2383 Akers Mill Road, Apt. D-14, Atlanta, Georgia. The executing officer is Gerald V. Montgomery.

5. Defendant Southeast Protection Services is a name under which East Coast Protective Services is registered with the Florida Department of State, Division of Corporations. The Chairman is Gerald V. Montgomery at 2045 Black Lake Boulevard, Winter Garden, Florida.

6. Defendant Southeast Airport Services, Inc. is a Florida corporation registered with the Florida Department of State, Division of Corporations as of February 18, 2013. The registered agent is Gerald V. Montgomery at 2045 Black Lake Boulevard, Winter Garden, Florida.

7. Defendant Thomas Behan is a Certified Public Accountant in Orlando, Florida. He worked as accountant and tax preparer for Gerald Montgomery and is his expert witness in Montgomery v. Montgomery pending before the Florida Divorce Court.

8. Defendant The Montgomery Davis Group is a corporation registered with the North Carolina Department of the Secretary of State effective April 12, 1999. The company was owned by Rhonda Montgomery Davis and is noted as administratively dissolved. The agent and manager for the company is Stanley Montgomery at 623 Summit Avenue, Greensboro, North Carolina.

9. Defendant The Montgomery-Davis Group Properties is a company allegedly owned by Rhonda Montgomery Davis and managed by Stanley Montgomery at 623 Summit Avenue in Greensboro, North Carolina. The company is noted as being administratively dissolved as of May 1, 2001.

10. Defendant Rhonda Montgomery Davis is the sister of Defendants Gerald and Stanley Montgmery and believed to be the owner of the Montgomery-Davis Group and Montgomery-Davis Group Properties.

11. Defendant Stanley Montgomery is the brother of Defendant Gerald Montgomery and is/was a realtor in Greensboro, North Carolina. He is listed as member/manager of the Montgomery-Davis Group and Montgomery Davis Group Properties and proprietor of a coffee shop in Greensboro, North Carolina, whose aliases include Coffee at the Summit, Montgomery's 623, Montgomery's 6 and 9.

12. Defendant Oasis Mortgage is/was a mortgage brokerage company located in High Point, North Carolina owned by James Penniegraft.

13. Defendant James Penniegraft was a mortgage broker and owner of Oasis Mortgage Company.

14. Defendant JoAnn Penniegraft Cheek is the sister of Defendant James Penniegraft and a former mortgage broker for Oasis Mortgage Company.

15. Defendant Mark Randolph is an attorney in Winston-Salem, North Carolina.

16. Defendant Jennifer Dalton, aka, Jennifer Dalton Watson, is/was a paralegal and notary for the State of North Carolina working in the office of attorney Mark Randolph at all times relevant.

17. Defendant Option One Mortgage is/was a mortgage lending company.

18. Defendant Southeastern Title Agency is a limited liability company, aka, Southeastern Title Agency, LLC, and Stewart Title Guaranty Company.

19. Defendant Stewart Title Guaranty Company is a Texas corporation doing business as Southeastern Title Company in Winston Salem, North Carolina that provided the title examinations and insurance for properties in Greensboro, North Carolina co-owned by the Plaintiff at 1508 Dunbar Street, 1602 Pichard Street, 1622 Pichard Street, and 2207 East Florida Street.

20. Defendant RBC Centura Bank, in conjunction with Oasis Mortgage financed one of two notes for the purchase of apartments on Martin Luther King Drive in Greensboro, North Carolina in 2003.

21.  Defendant Investors Title Insurance Company provided title examinations and insurance for apartments located at 906 and 1009 Martin Luther King Jr. Drive in Greensboro, North Carolina in 2003.

22. Defendant Duane Bryant is an attorney in High Point, North Carolina from whom Defendants Gerald Montgomery and Stanley Montgomery purchased apartments on Martin Luther King, Jr. Drive in Greensboro, North Carolina.  He also presented himself as attorney for Stanley Montgomery in 2007.

23. J. Rufus Farrior was the closing attorney for the Martin Luther King Jr. Drive apartments in Greensboro, North Carolina in 2003.

24. Defendant Litton Loan Servicing approved and closed on a mortgage brokered by Oasis Mortgage at 1612 Lincoln Street in Greensboro, North Carolina.

25. Defendant Washington Mutual is a federal bank that approved and closed a mortgage brokered by Oasis Mortgage on property at #1 Pine Ridge Court in Greensboro, North Carolina.

26. Defendant Chase Bank approved and closed on a mortgage brokered by Oasis Mortgage at 413 30th Avenue South, Atlantic Beach, South Carolina.

27. Defendant Armina Swittenberg was an attorney in Thomasville, North Carolina.  She is affiliated with the Empower Network and authors an online blog titled "Make Money with Armina."  She prepared the closing statements for properties purchased by Defendant Gerald and Stanley Montgomery on or about October 17, 2003.

28. Defendant Argent Mortgage is a mortgage lender that closed mortgage loans on five properties in the name of the Plaintiff and Defendant Gerald Montgomery in in May 2003.

29. Defendant Commonwealth Land Title Insurance Company is a title company located in Winston Salem, North Carolina.  The company provided title examinations and insurance for Defendants Gerald Montgomery, Oasis Mortgage, and Argent Mortgage for properties co-owned by the Plaintiff in Greensboro, North Carolina.

30. Defendant Attorney's Title Agency, a division of United General Title, does business as Commonwealth Land Title Insurance Company.

31. Defendant East Coast Hospitality Staffing is a business registered in the State of South Carolina to Vernessa Pertell.

32. Defendant Vernessa Pertell is/was a judicial assistant in the Horry County Summary Court in Myrtle Beach, South Carolina. According to documents filed with the South Carolina Secretary of State on November 22, 2010, she is the registered agent for East Coast Hospitality Staffing. She is listed on documents as Vice President of Corporate Operations for East Coast Protective Services. On or about January 31, 2011, Defendant Pertell was appointed Associate Judge in the town of Atlantic Beach by Defendants Jake Evans, Josephine Isom, and Charlene Taylor in a volunteer capacity.

33. Defendant Town of Atlantic Beach is a municipal corporation and subdivision of the State of South Carolina.

34. Defendant Jake Evans is a member of the Atlantic Beach town council at all times relevant.

35. Defendant Josephine Isom is/was a member of the Atlantic Beach town council at all times relevant.

36. Defendant Charlene Taylor is/was a member of the Atlantic Beach Town Council at all times relevant.

37. Defendant Joe Montgomery is a former mayor of the Town of Atlantic Beach. He was removed by the Governor in 1995. He is one of the originators of the Atlantic Beach mortgage scheme. Defendants Jake Evans, Josephine Isom, and Charlene Taylor appointed Defendant Joe Montgomery to the town's municipal election commission in 2013.

38. Defendant William Booker at all times relevant was town manager of Atlantic Beach, South Carolina.

39. Defendant Christopher Clagg is a volunteer for the town of Atlantic Beach.

40. Defendant Charles Williams is a former town manager of Atlantic Beach. His services were provided to the town in conjunction with his role as a consultant for the Municipal Association of South Carolina.

41. Defendant Tracy Edge is a member of the South Carolina Legislature representing House District 104.

42. Defendant Municipal Association of South Carolina is a quasi-governmental agency providing advisory services to the state's municipalities.

43. Defendant State Ethics Commission is the state agency responsible for enforcement

of the state's ethics laws.

44. Defendant Herbert Hayden is an employee of the State of South Carolina in the capacity of executive director of the State Ethics Commission.

45. Defendant Jim Bagnall is an employee of the State of South Carolina in the capacity of investigator for the State Ethics Commission.

## VENUE AND JURISDICTION

46. The Plaintiff is a resident of Atlantic Beach, South Carolina.

47. Defendants Gerald Montgomery and Thomas Behan are residents of Florida.

48. Defendant Carolina Health Care Services is a business incorporated by Defendant Gerald Montgomery was a business registered in North Carolina.

49. Defendant East Coast Protective Services is a business incorporated by Defendant Gerald Montgomery in the states of Florida, North Carolina and South Carolina.

50. Defendant Southeast Protective Services is a business incorporated by Defendant Gerald Montgomery in the state of Georgia.

51. Defendant Southeast Airport Services is a business incorporated by Defendant Gerald Montgomery in the state of Florida.

52. Defendant Rhonda Montgomery Davis is a resident of the state of Georgia.

53. Defendant Stanley Montgomery is a resident of the state of North Carolina.

54. Defendants Montgomery-Davis Group and Montgomery Davis Group Properties are businesses incorporated in the state of North Carolina.

55. Defendant James Penniegraft is a resident of North Carolina and owner of Oasis Mortgage, a business that was incorporated in the state of North Carolina.

56. Defendant JoAnn Cheek is believed to be a resident of North Carolina.

57. Defendants Armina Swittenberg, Esq., Duane Bryant, Esq., J. Rufus Farrior, Esq., Mark Randolph, Esq., and Jennifer Dalton Watson are residents of North Carolina.

58. Defendants Option One Mortgage, Southeastern Title Agency, Stewart Title and Guaranty Company, at all times relevant were businesses licensed to operate in the state of North Carolina.

59. Defendant RBC Centura Bank is licensed to operate in the state of North Carolina.

60. Defendant Investors Title Insurance Company is licensed to operate in the state of

North Carolina.

61. Defendants Litton Loan Servicing and Washington Mutual were federally approved multi-state mortgage lending institutions.

62. Defendant Chase Bank is a federally approved multi-state mortgage lending institution that financed real estate for Defendant Gerald Montgomery in South Carolina.

63. Defendants Argent Mortgage Commonwealth Land and Title Insurance Company, aka, Attorney's Title Company, a division of United General Title, at all times relevant were businesses licensed to operate in the state of North Carolina.

64. Defendants Tracy Edge, Christopher Clagg, and Vernessa Pertell are residents of Horry County, South Carolina.

65. East Coast Hospitality Staffing is a business registered in South Carolina.

66. Defendants William Booker, Jake Evans, Josephine Isom, Joe Montgomery and Charlene Taylor are residents of Atlantic Beach, South Carolina.

67. Defendant Town of Atlantic Beach is a municipal corporation, chartered as a subdivision of the State of South Carolina with its business operation in the town of Atlantic Beach, South Carolina.

68. Defendants Charles Williams, Jim Bagnall and Herbert Hayden are residents of the state of South Carolina.

69. Defendant State Ethics Commission of South Carolina has an office in Columbia, South Carolina.

70. Defendant Municipal Association of South Carolina has its principal office in Columbia, South Carolina.

71. Based upon the foregoing, this Court has subject matter jurisdiction and personal jurisdiction over the above-named parties hereto.

72. Venue is proper in the United States District Court.

## BACKGROUND INFORMATION

73.    In 1994, the Plaintiff and Defendant Gerald Montgomery were married and living in Pineville, North Carolina. This Defendant was employed by United Parcel Service as a Loss Prevention Supervisor. The Plaintiff managed the couple's real estate

investments in North Carolina. In 1996 the Plaintiff and Defendant purchased a house in North Myrtle Beach, South Carolina from the Plaintiff's friends and business partners Catherine Aldridge and her daughter, Hannah Ingland. In 1998, they purchased three oceanfront lots in Atlantic Beach, South Carolina. They joined with other Atlantic Beach landowners to help the floundering predominantly black town comply with federal and state laws to remain a municipality and preserve its history. The Plaintiff formed the Atlantic Beach Landowners Association. Retired South Carolina Supreme Court Chief Justice Ernest Finney, Jr. served as its president and the Plaintiff as secretary. In 1999 United Parcel Service transferred Defendant Gerald Montgomery to Little Rock, Arkansas as a Security Manager where he and the Plaintiff purchased a house.

74.    In March 2001, The Plaintiff attended a meeting of the Atlantic Beach Landowners Association where she and other members of the organization resigned their positions as officers and took volunteer positions with the town to decrease the town's expenses and stave off its impending bankruptcy. The Plaintiff accepted the position of interim town manager of Atlantic Beach.

75.    The Plaintiff met with members of the Tyson Beach Group, a newly formed company with Aldridge, Ingland and Defendant Gerald Montgomery where it was agreed that until she left her duties at Atlantic Beach she would have no interest and involvement in the company beyond what a court would deem her marital rights. It was further agreed that Defendant Gerald Montgomery would take over the Plaintiff's duties as manager of their real estate holdings in North Carolina. The South Carolina property was owned by the members of the Tyson Beach Group with Defendant Gerald Montgomery as the managing member of the corporation.

76.    In March 2002, the Plaintiff was hired as town manager of Atlantic Beach with a contract that acknowledged the first year she donated to the town and the second year that would be paid at the end of her term of employment whether by resignation or termination. The town began paying the Plaintiff in the third year of her tenure as town manager. In 2002 United Parcel Service transferred Defendant Gerald Montgomery to Oakland, California where he and the Plaintiff purchased a house in Dublin, California.

77.    On or about May 15, 2003, Defendants Gerald Montgomery, Stanley
Montgomery, and JoAnn Penniegraft Cheek made a surprise visit to the Plaintiff in
Atlantic Beach, South Carolina.  Stanley Montgomery was accompanied by his wife
and son. Defendant Gerald Montgomery introduced Cheek as a mortgage broker with
Oasis Mortgage.  Gerald Montgomery said Cheek and a friend had been invited to
stay at the couple's beach house while Cheek was considering opportunities to
finance projects for landowners in Atlantic Beach.  The Plaintiff queried Defendant
Gerald Montgomery as to Stanley Montgomery's role.  He responded that Stanley
Montgomery had introduced him to JoAnn Cheek and he wanted to bring his family
to the beach.  The Plaintiff was preparing the town for Bikefest, one of the largest
events held in South Carolina, and the fourth largest bike rally in the nation, and
running a summer school program so she had little time to spend with them on such
short notice.  Defendant Cheek did not discuss any business pertaining to the
Plaintiff's personal real estate holdings or Atlantic Beach.  The Plaintiff is unaware
of any meetings that Defendant Cheek had with any Atlantic Beach landowners.

78.    On or about June 9, 2003, the Plaintiff told her sister that she did not renew her
driver's license.  They discussed the matter of whether she would wait until she went
home to California to get a new license or get her license in South Carolina.  She
decided to get a South Carolina license for fear the airlines would not accept an
expired license as valid identification.  On or about June 10, 2003, the Plaintiff asked
a friend to drive her to the South Carolina Department of Motor Vehicles' office to
get a driver's license.  When the Plaintiff went to retrieve her driver's license from
her wallet it was not there.  After days of searching for her license she went back to
the DMV where she was told that without a license to turn in she would need her
birth certificate, social security card, and proof of residency by way of employment,
property deed, or bills.   The Plaintiff asked her sister in North Carolina to obtain a
copy of her birth certificate and send it to her.

79.    On or about July 29, 2003 Plaintiff Carolyn Cole presented her birth certificate,
social security card, and other documents at the office of the South Carolina
Department of Motor Vehicles and was issued a South Carolina driver's license.

80.    In August 2004, Defendant Gerald Montgomery was transferred to Orlando, Florida as a District Security Manager. He and the Plaintiff purchased a house in Windermere, Florida. The Plaintiff continued to work in Atlantic Beach until March 18, 2005 when the South Carolina Supreme Court resolved a contested election which resulted in a new town council majority that voted to terminate her.

81.    The Plaintiff returned home to Florida and began assessing the situation with their North Carolina rental properties and the Tyson Beach Group to take over managing the properties. Individual income taxes needed to be filed. While gathering information for their accountant to prepare their tax returns the Plaintiff learned that Defendant Gerald Montgomery was using the services of Carrie Passe as property manager and paying her off-book. Neither Defendant Gerald Montgomery nor Passe could produce accounting records for the real estate from March 2001 to 2005.

82.    In January 2006, the Plaintiff and Defendant Gerald Montgomery hired Janice Harrelson as asset manager and Sarah McKoy as their bookkeeper for the real estate investments.

83.    Defendant Gerald Montgomery informed the Plaintiff and their business partners that he was having some challenges with his new boss at UPS and wanted their help to build the real estate investment company to allow him to retire early. The Plaintiff and Aldridge agreed to allow funds to be used to build a house in Florida to re-sale. He selected a lakefront lot and they deposited the down payment. The Plaintiff and Defendant Gerald Montgomery attended meetings with the designers and made selections for the house.

84.    Through Harrelson and McKoy, the Plaintiff learned that money was missing from marital accounts, funds had been used from the business account to pay for personal indiscretions, and that Defendant Gerald Montgomery and Passe were overcharging rent to some of the Section 8 tenants. The Plaintiff presented the findings to Defendant Gerald Montgomery who blamed Passe. Passe confirmed that she kept the overpayment if paid in cash and sent checks or money orders to him. The Plaintiff and Harrelson refunded overpayments to Section 8 tenants still on their rent rolls and former tenants they could locate. Passe also revealed that Defendant

Stanley Montgomery and other Montgomery family members were collecting rent but did not give the money to her.

85.    The Plaintiff, Harrelson and McKoy began rebuilding the accounting records from cancelled checks and handwritten cash receipts same as McKoy and Harrelson had done pro bono for the town of Atlantic Beach from 2001 to 2005.

86.    Harrelson identified properties that had been acquired without the Plaintiff's knowledge. She visited the properties and presented to the Plaintiff that the condition of the properties was inconsistent with the amount of money allegedly spent for their maintenance and repairs as reported by Passe and Defendant Gerald Montgomery.

87.    The Plaintiff, Harrelson and McKoy interviewed Passe about the questionable condition of the properties. Passe informed them that the repairs allegedly done on the houses was done at the homes of other people and at 623 or 625 Summit Avenue in Greensboro, North Carolina. Harrelson and McKoy presented Passe with the opportunity to become an employee but she wanted to continue with the payment arrangement she had with Defendant Gerald Montgomery though she could not articulate it for Harrelson and McKoy. The Plaintiff terminated Passe's services.

88.    The Plaintiff considered Defendant Gerald Montgomery's declarations that he had no knowledge of the bank dilemmas, could not determine how much money had been paid to individuals and businesses, his unwillingness to provide receipts and invoices for monies expended, unexplained credit card expenditures, overall questionable business practices, and their deteriorating personal relationship. She told Defendant Gerald Montgomery that she wanted to divide their legitimate assets as equitably as possible and go their separate ways. Defendant Gerald Montgomery responded with verbal and physical abuse. The Plaintiff filed for divorce on June 23, 2006 in Florida, a no-fault state, citing irreconcilable differences.

89.    In July 2006, Defendant Gerald Montgomery agreed to and did sign authorization letters to allow Janice Harrelson to obtain information from the mortgage companies to complete the property files. Harrelson received a letter from AMC Mortgage Services, formerly Argent Mortgage, which stated, "We have reviewed the loans and found that the signature on the enclosed letter dated July 8, 2006 does not match your signature on the loan documents..." When presented with the letter Defendant

Gerald Montgomery refused to contact the mortgage loan companies to address the matter.   The Plaintiff and Harrelson were denied access to the mortgage loan files.

90.   Defendant Gerald Montgomery moved out of the house on February 5, 2007 and into a furnished corporate apartment.  The closing on the investment property was scheduled for the end of February.  The Plaintiff had spoken to the realtor and builder and found that they had a buyer for the property.  The sale would have netted about $200,000 in profit.  The realtor notified the Plaintiff that Defendant Gerald Montgomery had told them he was not going to sell the property.  The Plaintiff notified her attorney of the Defendant's plans to move into the house.  The Plaintiff told her attorney she would rather not close on the house.  The attorney told her that if she did not close on the house, the judge would see her as difficult, and penalize her for causing the loss.  The Plaintiff argued that the greater loss would be the $841,000 in cash they would be paying for the house.  The attorney told her that he spoke with the Plaintiff's attorney and Defendant Gerald Montgomery had no plans to move into the house.  The Plaintiff and Defendant Gerald Montgomery went to separate closings and signed the documents on the house at 2045 Black Lake Boulevard in Winter Garden, Florida.  Defendant Gerald Montgomery moved into the house after closing.

91.   The Plaintiff received a call from an in-law who revealed that Defendant Stanley Montgomery was arrested by the FBI in 2003 and that he had worn a GPS tracking bracelet and given probation in a mortgage fraud case.  The Plaintiff called Harrelson and asked her to go to the Federal Court in Greensboro and obtain any information pertaining to Defendant Stanley Montgomery that she could obtain under the Freedom of Information Act.  The Plaintiff received an overnight package from Harrelson containing documents that confirmed the indictments and sentencing of Defendants Stanley Montgomery, JoAnn Cheek, and James Penniegraft.

92.   The Plaintiff pulled the mortgage loan files from storage in her garage and saw that all of the properties she originally owned with Defendant Gerald Montgomery in North Carolina had been refinanced or cashed-out with mortgages brokered by Defendant JoAnn Cheek of Oasis Mortgage.   The new rental property acquisitions were in Gerald Montgomery's name only, brokered by JoAnn Cheek to Argent Mortgage.   There were mortgage documents prepared by Oasis Mortgage on

properties that the Plaintiff and Defendant Gerald Montgomery did not own but with Gerald Montgomery as borrower. There were multiple sets of mortgage documents on properties in the name of Defendant Gerald Montgomery solely and together with the Plaintiff that contained the same closing dates, different sales prices and appraised values.

93.     On or about March 6, 2007, in violation of the Florida Family Court's Administrative Order, Defendant Gerald Montgomery closed bank accounts and removed the Plaintiff's name from credit card accounts which prevented her from paying the household bills and transferring funds to cover the shortfall for the real estate claiming that he did so in response to her failure to call him on his birthday.

94.     Defendant Gerald Montgomery directed Harrelson to cease managing the investment real estate and to return the checks for the business account. Defendant Gerald Montgomery resumed management of the rental property in North Carolina in March 2007.

95.     On or about March 16, 2007, the Plaintiff received a letter from Defendant Duane Bryant as representative for Stanley Montgomery in which he stated, "While I cannot tell you how to handle your situation, I can tell you that these efforts to embroil Stan and your husband in any imaginary conspiracy is wrong.  As such I must ask you to stop.  I am instructed to tell you that if you persist with this sort of behavior then I must seek extraordinary relief… Please ask your attorney about my ability to secure jurisdiction over you in this situation."

96.     On April 2, 2007, the Plaintiff's attorney, Abigail Schroeder, submitted subpoenas to Defendant Gerald Montgomery's attorney, Dorothy McMichen that included mortgage companies and banks.  On or about April 30, 2007, Defendant Gerald Montgomery, through his attorney objected to 37 of the 39 subpoenas.


Harassment in Florida

97.     The Plaintiff went on vacation in 2007 and when she returned home she received a water bill for over $1000.  The water company came out to check the property but could not find the source of the problem.  When the Plaintiff moved to South Carolina she had the water service disconnected.  Each time the Plaintiff restored water service

to the property she received an excessive use water bill. Water damage to the interior of the home was attributed to a severed water line from the refrigerator. The Prices had gone to Florida with the Plaintiff and surveyed the water damage at the marital home and sealed the doors after several break-ins. Mr. Price located the source of the water issue. Alleged vandals had been opening a water line and allowing gallons of water to flow into the lake.

98.     The Florida Court had ordered the Florida homes in Windermere and Winter Garden sold. Defendant Gerald Montgomery denied the realtor and clients access to the home in Winter Garden and in 2013 he called and threatened the broker after she provided and updated listing agreement from the Plaintiff.

99.     Alleged vandals began dismantling the marital home in Windermere taking the built-ins and theater seating the Court denied Defendant Gerald Montgomery. Reports were filed with the Orange County Sheriff's office in 2012.
While the Plaintiff was working to prevent the foreclosure on the property, Defendant Gerald Montgomery appeared in Court on the side of the banks seeking the foreclosure. Documents received in discovery reveal mortgage fraud on the marital home similar to that found on the North Carolina properties along with other questionable transactions.

100.     The Plaintiff's tires were slashed and her car broken into in Florida. A police report was filed after the break-in and theft of items from the vehicle.

101.     Defendant Gerald Montgomery filed a tortious interference claim alleging the Plaintiff caused his separation from his job at United Parcel Service. The Plaintiff's attorney issued a subpoena to United Parcel Service to obtain the personnel file. Defendant Gerald Montgomery objected to the subpoena. After a hearing the Court agreed that since he had made the allegation the Plaintiff was entitled to the file to defend herself. The Plaintiff and her attorney signed a confidentiality agreement for UPS and received the file.

102.     In February 2008, after repeated incidents of verbal and physical abuse from Defendant Gerald Montgomery, the Plaintiff sought and received a restraining order. After the hearing on the matter, the Court ordered him to attend twenty-six weeks of battery classes and to stay away from the Plaintiff for one year.

103.    Defendant Gerald Montgomery made repeated requests to the Court to re-enter the marital home. He presented to the Court that he needed access to files remaining in the home and to videotape the furniture. The Court denied his request.

104.    At a hearing before Judge Janet Thorpe on April 30, 2008, Defendant Gerald Montgomery's attorney admitted to the Florida Divorce Court that the expenses for the properties exceeded their income and that the properties had no equity in them as stated on p. 29, lines 21 – 23 of the transcript, "Of those rental properties, and there are deficits of about five thousand dollars a month because they pulled the equity out."

105.    The Plaintiff agreed to a court-order management period of the real estate at a hearing in the Florida Divorce Court on April 30, 2008 with the belief that this would give her the opportunity to access information about the properties. Defendant Gerald Montgomery immediately began calling tenants and trying to sabotage her efforts to effectively manage the properties. The Plaintiff discovered foreclosure notices on several of the properties and mortgage and other accounts in arrears. The Plaintiff brought the mortgages current with borrowed funds and income from the property.

106.    On March 7, 2008, the Plaintiff's attorney Barry Rigby sent a letter to Defendant Gerald Montgomery's attorney with authorization letters to banks and mortgage companies that would allow them to release documents to the Plaintiff. He expressed, "I am concerned that we cannot get them in time through ordinary discovery channels. I will transmit the original signed letters to the people and entities in question. If I do not have the signed letters by noon on Wednesday the 12th, I will assume that your client does not intend to sign these letters and I will file a motion to compel." Defendant Gerald Montgomery did not sign the letters, a motion to compel was filed and at the hearing before Judge Blackwell the Plaintiff's attorney suggested that a magistrate judge be permitted to resolve the discovery matters. Judge Blackwell agreed and ordered the matter referred to the General Magistrate.

107.    A hearing was held before magistrate Judge Anthony Moreno on October 7, 2008 to resolve discovery issues. On November 10, 2008 the Defendant Gerald Montgomery's attorney sent a letter to Judge Moreno containing the list of items to be

16

produced as submitted by the Plaintiff's attorney at the magistrate hearing.   On November 12, 2008, Judge Moreno submitted a "Report and Recommendation of General Magistrate" to Judge Alice Blackwell and noticed the Plaintiff and Defendant Gerald Montgomery as Petitioner and Respondent through their respective attorneys which was followed by an "Order on Report and Recommendations of General Magistrate" and an "Order on Discovery Matters" signed by Judge Blackwell on December 3, 2008.  Judge Moreno states in his report that "at the conclusion of the hearing, the undersigned made certain findings resolving all of the issues presented, and the parties thereafter submitted an agreed-to, proposed Order on Discovery Matters (the "proposed Order"), which contains all of the undersigned findings with regard to this matter."  The list of documents that Defendant Gerald Montgomery had agreed to produce and so ordered by the Florida Court included the mortgage companies, banks, Mark Randolph, Armina Swittenberg, and Stanley Montgomery, all relevant defendants named herein.

108.    On November 14, 2008, Defendant Gerald Montgomery's attorney selected releases to mortgage companies and banks that he would sign and excused his unwillingness to sign all of the releases, stating "the remaining releases requested by Ms. Montgomery [the Plaintiff] are no longer active in that the properties have been sold and the mortgages paid off so Ms. Montgomery has no need for the releases. The releases which Defendant Gerald Montgomery decided would be no longer active and withheld are Wells Fargo Mortgage Company, RBC Centura, Pontus Capital, LLC, and First Citizens Bank and Trust."

109.    In November 2008, Defendant Gerald Montgomery presented to the Court that he was without furniture and requested to return to the marital home to get furniture. The court denied his request.  The Plaintiff was allowed to put the furniture in a storage unit and the keys were delivered to his attorney.

110.    Defendant Gerald Montgomery continued to make division of the furniture a central issue in the divorce case.   Attempts at equitable distribution through a court-ordered process failed.  The Plaintiff had given Defendant Gerald Montgomery and some of his family members furniture in storage from their homes in South Carolina, Arkansas, and California.  The furniture in storage was to be counted and would have

gone into Defendant Gerald Montgomery's column. The meeting to divide the furniture was held in the Plaintiff's attorney's office. The effort was thwarted by the Defendant's attorney who began calling the Plaintiff derogatory names. The Plaintiff's attorney ended the meeting.

111.    In a letter dated January 28, 2009 his attorney withdrew her objection to the subpoenas for some but not all of the banks and mortgage companies. In a letter dated February 4, 2009, she reiterated her position that she did not object to specific subpoenas and waived the ten day waiting period. Still this did not include all of the banks, mortgage companies, and attorneys so ordered by the Florida Court.

112.    In February 2009 the Plaintiff's restraining order against Defendant Gerald Montgomery expired.

113.    In March 2009, Argent Mortgage and Option One Mortgage sent scanned files of the mortgage loan closing files for the properties that were closed by Mark Randolph and Armina Swittenberg. The Plaintiff's attorney sent copies of the scanned files to Defendant Gerald Montgomery's attorney who claimed never to have received copies of the files. The Plaintiff's attorney provided copies of the compact discs containing the scanned files and printed hard copies of the files along with copies of all of the Plaintiff's discovery in bound notebooks by categories of accounts and reviewed them with Defendant Gerald Montgomery's attorney in her office prior to the start of the Plaintiff's scheduled deposition.

114.    On March 11, 2009, Defendant Gerald Montgomery, through his attorney, again objected to the Plaintiff's request for production from Defendant Mark Randolph and the law firm of Randolph & Moir.

115.    On March 29, 2009, Robert Morris, a reporter with the Sun News in Myrtle Beach, South Carolina published an article based on interviews with the Plaintiff, Defendants Gerald Montgomery, Charles Williams, and Herbert Hayden in response about the Tyson Beach Group lawsuit she filed against the town of Atlantic Beach. Morris and Defendant Herbert Hayden reprised the ethics charge from 2004 for which the State Ethics Commission had exonerated the Plaintiff. Hayden presented that the State Ethics Commission did not find the Plaintiff guilty because of a loophole in the law. Morris adds, "At the direction of the Municipal Association of South Carolina,

attorneys are now asking the suit to be reopened.  Their position, said association employee and Atlantic Beach's former town manager, Charles Williams, is that Carolyn Montgomery has no right to sue the town because she was never an official part of the Tyson Beach Group."  Defendant Williams said, "It was such a conflict of interest – only one person wrote checks to the town and received the money, only her husband, Gerald, has the right to sue the town, and he knew nothing about the lawsuit."  Morris included other false statements about matters involving the Plaintiff in his article that he attributed to defendants Hayden, Williams, and Gerald Montgomery. Morris incorrectly states the reason for the town's lack of funds in 2001 when the Plaintiff became town manager.  The loan funds were used primarily to pay the salaries of police officers to meet a delinquent matching requirement for a COPS grant the town received.  Former town officials had spent the grant money and were facing a $100,000 request for payment from the federal government when the funds were borrowed. The Plaintiff corrected the issues with the COPS grant and the town passed the federal audit in 2004.  Additional funds were used to correct misappropriated funds from Parks Recreation and Tourism, to secure professional marketing assistance for Bikefest, and to purchase office furniture, computers, and printers for the town hall.   The Plaintiff told Morris that she was going through a difficult divorce that involved domestic violence and a disgruntled spouse and told him of her conflict with Defendant Williams and told him that most of what he was asking her to respond to was false and based on personal vendettas.  Morris concludes his article with a quote from Williams, "We're trying to get somebody, even the ethics commission, to take a second look at this case."

116.    In April 2009, Mark Randolph sent a partial closing file for property owned by the Plaintiff and Defendant Gerald Montgomery at 1701 Montford Drive.  The information did not include copies of cancelled checks and other information about the disbursement of funds as requested.  The property had been gifted to the Plaintiff and Defendant Gerald Montgomery by Catherine Aldridge in the 1990's.  The Plaintiff had asked Aldridge to put the gift in the name of Defendant Gerald Montgomery.   The Defendant Gerald Montgomery got a second on the property through First Citizens Bank and he and the Plaintiff used the funds mostly to acquire

other real estate.  Defendants Gerald Montgomery, Cheek, and Randolph had refinanced the property in 2002 without the Plaintiff's knowledge and taken cash out. The new loan was brokered by Cheek to First Citizens Bank.  In a letter dated April 22, 2009, Attorney Barry Rigby requested the cancelled check and disbursement of funds noted on the HUD-1.  Defendant Randolph, in a follow-up telephone conversation with Rigby and the Plaintff, agreed to send the requested documentation.

117.    The Plaintiff and Defendant Gerald Montgomery's divorce was granted in a bifurcated process on or about April 23, 2009.  This portion of the case to divide the assets has lingered in the court since 2009.

118.    In a letter dated May 4, 2009 Attorney Rigby informed Randolph that the divorce trial did not take place and that he was still in need of the requested items.      A few weeks later Randolph sent a copy of the Plaintiff's South Carolina driver's license with no explanation, a license she did not have when he closed the loans for Defendant Gerald Montgomery.

119.    The Plaintiff was contacted by the Atlantic Beach Christian Methodist Church with a request to barter an arrangement to renovate the four-unit apartment building at 413 30th Avenue in Atlantic Beach.  Rather than demolish it the Plaintiff agreed and in a letter dated May 2009, the Plaintiff informed Defendant William Booker that she had decided to exercise the option of renovating the apartments.  Rev. Windy Price, pastor of the church and her husband, a general contractor offered his labor at no charge to renovate the property in exchange for use of three of the units.  The apartments were across the street from the church and Rev. Price had decided to move their family to Atlantic Beach where Rev. Price was going to be a candidate in the November 2009 election.

120.    On or about June/July 2009, the Plaintiff agreed to sell office furniture from the office of G. V. Montgomery, LLC in Greensboro, North Carolina to Benny Webb in South Carolina.

121.    In August 2009, the Plaintiff gave household furniture and a 1988 Mercedes 560 SL to Catherine Aldridge who in turn sold the car and some of the furniture as partial

payment on the joint debt she was owed by the Plaintiff and Defendant Gerald Montgomery. The Plaintiff moved to Atlantic Beach, South Carolina.

122.     In August/September 2009, the Atlantic Beach Police Chief came to the property at 413 30th Avenue and told the Plaintiff that Defendant William Booker was on the telephone with Defendant Gerald Montgomery who had directed them to remove her Darnell Price from the property. The Plaintiff told the police chief that she had a court order to manage the properties but if Defendant Gerald Montgomery would put that request in writing, sign it and date it they would remove themselves from the property. The police chief returned and told her that Defendant Booker and the staff were searching the records looking for documents that show the property as condemned but could not find anything. Darnell Price and a painter proceeded with painting the exterior of the building.

123.     The Atlantic Beach Police officers returned to the property daily. According to the police chief and officers Defendant Booker directed them to issue a tickets to Darnell Price each day that he was on the property. The Plaintiff had appliances delivered to the units and Darnell Price, the Plaintiff, and others were on property observing the deliverymen. The Atlantic Beach Police officer arrived and apologized to Darnell Price as he handed him a ticket.

124.     On September 30, 2009 Defendant Gerald Montgomery and Donald Booker registered Defendant Carolina Health Care Services as a North Carolina corporation with the Department of the Secretary of State.

125.     In October 2009, some citizens of Atlantic Beach told the Plaintiff they were going to write her name on the ballot for town council member. The Plaintiff and her colleague Rev. Windy Price won as write-in candidates. Defendants Isom and Taylor, the incumbent and losing candidates protested the election to the Municipal Election Commission and Horry County Circuit Court.

126.     Defendant Gerald Montgomery raised the furniture issue again in the Florida Divorce Court. The Plaintiff's attorney filed a motion informing the Court that she had given the Defendant all of the furniture in storage in South Carolina, most of the furniture from the marital home and that it was still awaiting pickup in a Florida storage unit, the furniture she had delivered to Aldridge, and the office furniture from

Greensboro, North Carolina. The Plaintiff accompanied her attorney to the courthouse when she filed the document and delivered it to the Defendant's attorney. The Plaintiff's motion was not found in the Florida court file. The Plaintiff's attorney recommended the appointment of a master-in-equity to resolve the furniture issue. The Plaintiff did not have the funds for a master-in-equity and again offered the furniture. The court appointed a master-in-equity to be paid for by both parties.

127. Defendant Gerald Montgomery registered Defendant East Coast Protective Services as a corporation in North Carolina on February 23, 2010 and in South Carolina on October 20, 2010.

128. The Plaintiff registered to vote in Atlantic Beach, South Carolina.

129. Defendant Vernessa Pertell registered East Coast Hospitality Staffing as a business in the state of South Carolina on November 22, 2010. She is listed on documents as Vice President of Corporate Operations for East Coast Protective Services.

130. Medical records and legal documents pertaining to the Plaintiff and individuals that had befriended the Plaintiff were circulated in the town of Atlantic Beach.

131. The Plaintiff and the Price family were put under surveillance and their routine errands and other activities including church, school, business and social activities were being monitored and interfered with by an unknown quantity.

132. Voters in the town of Atlantic Beach wrote the names of Rev. Windy Price and the Plaintiff on ballots in the November 2009 town council election. Rev. Price and the Plaintiff won the election which was overturned by a three member municipal election commission with the deciding vote cast by Defendant William Booker's wife.

133. An individual appeared at the challenge ballot hearing and testified that he had the Plaintiff and the Price family under surveillance. In an attempt to strip the Plaintiff and Rev. Price of their right to vote and hold office in the town, he presented himself as a private investigator. He claimed to know their whereabouts at all times and acknowledged he had been tracking their vehicles. He was asked to provide his credentials. He did not have the requisite South Carolina credentials for a private

investigator and did not offer any other credentials. He refused to disclose the name of his client and did not return for subsequent hearings.

134.    Defendant Gerald Montgomery asked the Florida Divorce Court to strike pleadings relative to the North Carolina properties. Judge Alice Blackwell granted his motion to strike pleadings relative to the North Carolina properties and allowed him to pay for expenses related to the properties only if they were necessary. The Plaintiff paid all expenses associated with the real estate.

135.    Defendant Gerald Montgomery's argument changed to a request that the Plaintiff compensate him for losses sustained from the North Carolina and South Carolina real estate investments. Profits would be his and losses would be hers. Defendant Thomas Behan created summaries and based their argument on tax returns from 2001 to 2005. Defendant Gerald Montgomery wanted the Court to divide the marital assets without allowing the Plaintiff or the Court the opportunity to see the mortgage loan files and transactions from March 2001 to December 2005 and March 2007 to April 30, 2008 when he managed the real estate.

136.    In 2010, the Plaintiff and Rev. Price appealed the Municipal Election Commission's decision to the Horry County Circuit Court who upheld the decision not to seat Rev. Price and the Plaintiff.

137.    In July 2010, the Plaintiff's breach of employment contract lawsuit was heard in the Horry County Circuit Court. The Court ruled in the Plaintiff's favor and issued a judgment against the town of Atlantic Beach.

138.    In July 2010, Willa Dewitt's lawsuit alleging she was owed money as a result of the mortgage loans she and her father made to the town was scheduled to be heard in the Horry County Circuit Court. The Plaintiff encountered Defendants Booker, Taylor and Evans and some of the alleged mortgagees in the courtroom. She asked Booker about the town's defense and he claimed they could not offer a defense because they lacked documents to prove the town repaid the loans. The Plaintiff told Defendant Booker that copies of the documents were left in town hall and given to law enforcement agencies, several citizens, and Defendant Taylor. The Plaintiff went to a town council meeting and during time for public comment gave compact discs

containing copies of the scanned mortgage loan files to Defendants Evans, Isom, Taylor, and Booker.

139. Defendants Evans, Isom, and Taylor appointed Defendant Vernessa Pertell as a "volunteer" judge in Atlantic Beach to serve simultaneously with the town's paid judge. Pertell was sworn in on January 31, 2011. Defendant Pertell, at the same time was employed in the Horry County Magistrate's office as a judicial assistant, and listed as Vice President of Operations for companies owned by Defendant Gerald Montgomery.

140. In 2011, Defendant Gerald Montgomery's attorney would again claim before the Florida Court that he did not receive documents from the Plaintiff which turned into we received the hard copies but not the Quickbooks file to acknowledgement of receipt of the Quickbooks file but the claim they did not receive the password. On May 13, 2011, Defendant Gerald Montgomery's attorney filed a "Motion for Protective Order and Objection to Issuance of Subpoenas and Respondent/Former Husband's Motion to Quash Subpoenas and Motions for Sanctions."

141. On July 28, 2010 the Plaintiff attended church at the Atlantic Beach CME Church, Atlantic Beach Police arrested Rev. Windy Price and Darnell Price, and seized the church for an alleged code violation. The Atlantic Beach police put crime scene tape around the church. Defendant Booker notified the electric company to shut off electric service to the church and the apartments.

142. Darnell Price was arrested for allegedly operating a business without a license that he did not own. Defendant Pertell signed the arrest warrant.

143. All of the Plaintiff's associates in Atlantic Beach were arrested on false charges that were later dropped in Horry County Circuit Court in 2012.

144. In the Plaintiff's deposition in 2010 regarding the Tyson Beach Group lawsuit, the Plaintiff's attorney raised the issue of scheduling court dates for the Plaintiff and whether or not it was coincidence that whenever the Plaintiff had a court date in Florida she would receive notice of the same date for Atlantic Beach, Horry County or the State Ethics Commission.

145. The South Carolina Supreme Court in Opinion No. 26996 overturned the Horry County Circuit Court's decision in the Atlantic Beach town council election. Rev. Price and the Plaintiff attended their first town council meeting on July 26, 2011.

146. The details of the harassment campaign to prevent the Plaintiff and the Price family from moving into Atlantic Beach and subsequently from holding office are detailed in the election case and included herein by reference.

147. Defendant Gerald Montgomery's attorney had filed several Notices of Production listing documents provided by the Plaintiff as documents provided by her client.

148. Attorney Barry Rigby signed an Affidavit on December 16, 2011 attesting to his production of documents and the issues surrounding discovery in the divorce case.

149. In 2011 Judge McDonald ordered discovery re-opened for both parties to reproduce all documents whether or not they had been previously produced.

150. Attorney for the Plaintiff, Kathleen Davies, reproduced all prior discovery on March 5, 2012 and re-issued Notices of Production from Non-Party on November 16, 2012 and subpoenas on December 7, 2012.

151. In 2013 a federal agency directed the Plaintiff to go back to the place where her license went missing in 2003 and file a police report. The Plaintiff filed a report with the Atlantic Beach Police Department on January 24, 2013.

152. Davies, on behalf of the Plaintiff re-issued Notices of Production from Non-Party and subpoenas were re-issued on February 13, 2013 to Defendants Chase Bank, Mark Randolph, Randolph and Moir, Southeast Protective Services and East Coast Protective Services.

153. The Plaintiff's attorney issued Notices of Production from Non-Party on August 13, 2013 to Defendants Commonwealth Land and Title, First American, General American Corporation, Stewart Title Guaranty, and North American Title Company. The Plaintiff's attorney issued subpoenas on August 29, 2013.

154. On November 7, 2013, Defendant Gerald Montgomery's attorney sent a letter to the Plaintiff's attorney requesting to be informed when documents arrived as a result of subpoenas to General American Corporation and North American Title.

155. The harassment campaign against the Plaintiff is rooted in the aforementioned facts and continues with the involvement of multiple people who executed their own

individual strategies to violate the Plaintiff's rights within the larger campaign. Most of them are named as defendants in this case and their tactics described herein.

## Categories of Defendants

156.    There are three categories of Defendants in this case. Defendant Gerald, Montgomery and the people who participated in the mortgage fraud scheme with him in North Carolina comprise the first category of defendants. Defendant Gerald Montgomery and the people in state government in South Carolina comprise the second category of defendants and the Atlantic Beach government that had a mortgage fraud issue of their own to conceal are the third category of defendants.

## Defendant Gerald Montgomery

157.    Defendant Gerald Montgomery as the Plaintiff's spouse and in the context of the job he held and the relationship with their business partners feigned his pride in the Plaintiff's sense of duty to the taxpayers of Atlantic Beach that required her as a town employee to report findings from the town's mortgage fraud investigation to the public and law enforcement to end the town's mortgage fraud scam. Defendant Gerald Montgomery as the Plaintiff's former spouse and batterer with a mortgage fraud scheme of his own to conceal and marital assets worth millions of dollars that he had no intention of sharing with the Plaintiff, no matter how equitably divided, sought ways to discredit and financially debilitate her without being detected.

158.    As a result of the domestic violence hearing before the Florida Court he had been ordered to stay away from the Plaintiff for a year and to attend twenty-six weeks of classes for batterers. The restraining order issued by the Florida Court and the Plaintiff's plans to relocate to Atlantic Beach denied Defendant Gerald Montgomery access to her.

159.    The year-long period of protection for the Plaintiff had just ended in March 2009 when Reporter Robert Morris contacted the Plaintiff and with his article published in the Sun News launched Defendant Gerald Montgomery's collaborative harassment campaign with Defendants Herbert Hayden and Charles Williams.

160.    Among the Atlantic Beach officials, employees, and board appointees, both former and current, Defendant Gerald Montgomery found willing participants for his harassment campaign.  He joined forces with the Plaintiff's political enemies in Atlantic Beach who in turn reached out to their network of allies and public officials beyond the town of Atlantic Beach; those that have for years been a part of the life support for the criminal enterprise of Atlantic Beach disguised as a municipal government.  Defendant Gerald Montgomery and his co-defendants are simply a classic case of "the enemy of my enemy is my friend."

161.    The mortgage fraud issue the Plaintiff discovered in her home required the same tedious, extensive, and expensive research to obtain facts as she experienced in the Town of Atlantic Beach.  She encountered the same resistance and some of the same tactics to discourage her efforts.  Documents were stolen.  Subpoenas went unanswered.  The Plaintiff was threatened and harassed as were others working with her or supporting her.  People used their public platforms, professional positions, and influence to vilify, bully, and intimidate the Plaintiff and her associates.  Most of her associates were arrested on false charges that were later dropped when they were all herded into a county courtroom as a group in 2012.  The Defendants participated in a well-documented harassment campaign to silence the Plaintiff that touched every aspect of her life and violated her civil rights for political and financial gain.

162.    Defendant Gerald Montgomery, masquerading as a self-made millionaire had control of the Plaintiff's share of their marital assets and was limiting her ability to move forward in the Florida Divorce Court.  While he was denying he had the assets, dissipating some of them, and concealing others he was simultaneously opening and operating a variety of new businesses, loaning money to family and friends, contributing to political campaigns, and providing money to some of the people involved in his North Carolina mortgage fraud scheme.   The Plaintiff's associates in Atlantic Beach were baffled as their private information including medical records, were being distributed in the town.  Questions were being raised as to whom and under what conditions was such information being released in violation of the law. Defendant Gerald Montgomery and a person named "Donald Booker" opened Carolina Health Care Services, East Coast Protective Service, Southeast Protective

Services, and Southeast Airport Services. The notion that anyone would go to such extremes seemed far-fetched but the Plaintiff had seen first-hand the legal documentation that Defendant Joe Montgomery in his capacity as mayor of Atlantic Beach created in conjunction with the town's former attorney, a state representative, and alleged mortgage holders to legitimize the town's mortgage fraud scheme. Additionally, Defendants Evans, Isom, Taylor, Booker, Williams, Pertell, and Joe Montgomery had all been participants in elaborate schemes involving the town's municipal court, property maintenance board, and elections from 2009 to the present that resulted in the Plaintiff's loss of the property at 413 30th Avenue to foreclosure; arrests of the husband and wife that allowed the Plaintiff to reside in their home; the arrest of friends in Atlantic Beach including the woman helping to operate the restaurant at 601 31st Avenue; the seizure of the church the Plaintiff was attending, and the attempt to prevent the Plaintiff from taking her seat on the town council of Atlantic Beach after she won the 2009 and 2013 elections.

163.     Defendants Gerald Montgomery and Stanley Montgomery had used the Plaintiff's name and reputation in a scheme that defamed her character from the 1980's to 1990. Defendant Stanley Montgomery was involved in an extramarital affair with a woman named "Carolyn" and members of the Montgomery family led his wife to believe it was the Plaintiff. The Plaintiff received telephone calls, insults and verbal abuse for years. After a child was born and the family could no longer conceal their scheme from the wife or the Plaintiff, her mother-in-law asked, "What difference does it make as long as you know it's not you?" The Defendant brothers showed no remorse and offered no apology. Aligning himself with the Atlantic Beach defendants and their network, stealing the Plaintiff's driver's license and using it to commit mortgage fraud was just as inconsequential to them.

164.     After several years, multiple attorneys and consults with law enforcement the Plaintiff accepted that the actions of Defendant Gerald Montgomery and his co-conspirators far exceeded those of a "normal" divorce. There are bankers that knowingly accepted false signatures and violated banking laws to transfer the couple's funds to accounts specifically for Defendant Gerald Montgomery in violation of federal laws and Florida state laws. Defendant Behan blurred the lines

between expert witness, fee paid accountant, conspirator, and accessory. He crossed the line when he authorized Defendant Gerald Montgomery to sell stock without an order from the Florida Divorce Court.    The documents in hand and the responses to the Plaintiff's request for documentation on which her name is signed indicate an unimaginable level of sloppiness, comfort, recklessness, and disregard for any aspect of the law, property or person. Abuse as a harsh descriptive is gentle compared to the atrocities committed herein.  Domestic violence involving one man and one woman is sufficiently complex with staggering statistics that do not favor victims. It is unfathomable when one woman is forced to fight her batterer, a cadre of individuals, financial institutions, and governmental agencies for her right to her own life. The fact that so many individuals willingly victimized the Plaintiff and spurred each other on justifying their participation in the lynching as something she deserved as a politically involved outspoken woman is unfathomable. Defendant Gerald Montgomery contributed to a letter the Atlantic Beach defendants circulated and attributed to "Concerned Citizens of Horry County" in which they invented a degrading biography for the Plaintiff that fails to offer among its extracts of truth the fact that her sister was murdered by her husband in 1977, information more relevant to the situation at hand and more than enough motivation to end her marriage, protect her family, friends, and herself.

165.    During the marriage the Plaintiff allowed Defendant Gerald Montgomery to hold most of their assets in his name as an agreed upon safe alternative for protection of their assets. As town manager of Atlantic Beach she was named individually in lawsuits filed against the town until the appropriate measures were taken by town attorneys to address her in her official capacity. In 2013, the Plaintiff's research revealed that while Defendant Gerald Montgomery was claiming before the Florida Divorce Court that he did not know the whereabouts of millions of dollars in marital assets, he had engaged in illegal transactions with the help of bankers to conceal those assets in violation of Florida law and the Court's Administrative Order. A man the Plaintiff thought she knew for 30 years had become unrecognizable to her as a husband, business partner, or friend. Defendant Gerald Montgomery dismissed any offers from the Plaintiff to settle their accounts as amicably and equitably as possible

themselves and end the marriage. Instead he responded with verbal and physical abuse. The Plaintiff filed for divorce in June 2006 in Florida, a no-fault state where the only justice the Court offers is equitable distribution. Defendant Gerald Montgomery failed to convince the Plaintiff to stay in the marriage by persuasion, force or withholding her share of their assets. The divorce process became his own private circus and the Plaintiff's nightmare. His greed and need to control and further victimize the Plaintiff motivated him to ask the Florida Court to charge her for debts on properties he refinanced and acquired without her knowledge which made discovery on the rental properties a major issue in the divorce case. Routine discovery and the production of documents was thwarted first with the excuse that Defendant Gerald Montgomery left the marital home with only his clothes and that the Plaintiff had control of all of the files which he could not access. Two judges declined his request to be allowed back into the marital home in violation of the restraining order

166.    Defendant Gerald Montgomery's participation in the mortgage fraud scheme had gone undetected by the Plaintiff and law enforcement until he made the real estate an issue in the divorce case. He could not resist the opportunity to take more jabs at the Plaintiff. His decision to make her liable for the losses he created on their real estate increased his need to delay and deny the Plaintiff's access to the mortgage loan files through an elaborate discovery ruse that has been ongoing for more than seven years. Defendant Gerald Montgomery expects this discovery ruse to exceed the legal requirement for document retention by lending institutions, to enable him to raise a statute of limitation defense, to dissipate the Plaintiff's assets and hamper the Plaintiff's ability to continue with litigation and ultimately do her more harm.

## North Carolina Real Estate Transactions

167.    The Plaintiff managed real estate investments she co-owned with Defendant Gerald Montgomery from approximately 1989 to March 2001. Defendant Gerald Montgomery assumed management of the properties when the Plaintiff volunteered for one year as town manager of Atlantic Beach. She was subsequently hired for the position. In 2005, the Plaintiff returned home to Florida prepared to resume her role

managing their investments. Janice Harrelson began work as the asset manager for
the Plaintiff and Defendant Gerald Montgomery in January 2006. The Plaintiff and
Harrelson began gathering information to complete delinquent tax returns and
realized that the Defendant and his property manager, Carrie Passe, had not used any
recognizable recordkeeping system to account for the income and expenditures
associated with the real estate. The Plaintiff learned from Passe and Harrelson that
Section 8 Tenants had financial arrangements off-book to pay rents in excess of what
they were reporting to the Housing Authority. She repaid the tenants that she could
locate, dismissed Passe, and put the management of their real estate completely in the
hands of Janice Harrelson and Sarah McKoy.

168.    The Plaintiff had served on the North Carolina Human Relations Commission
where she was responsible for enforcing fair housing laws.   When the Plaintiff and
Defendant Gerald Montgomery agreed to invest in rental property the Plaintiff told
him that she would do so as long as they were never slum lords. The Plaintiff took a
great deal of pride in the kind of renovations and maintenance they did on properties
above and beyond the minimum requirements.

169.    In March 2007 Defendant Gerald Montgomery alleged that he was angry with the
Plaintiff when she did not telephone him on his birthday and began closing bank
accounts, removing funds, threatening to cancel her health insurance, preventing the
Plaintiff from paying marital debts, expenses associated with the investment real
estate and other business obligations.   The Plaintiff purchased a health insurance
policy and borrowed additional funds from Catherine Aldridge. Defendant Gerald
Montgomery sought to cripple Ms. Aldridge financially by refusing to repay funds
borrowed from her during the marriage, trying to force the property in Atlantic Beach
co-owned with her into foreclosure. The Plaintiff opened a new bank account solely
in her name. Defendant Gerald Montgomery lied to the bank's officers and told them
the money in the account was stolen from him. The bank froze the Plaintiff's account
and proceeded with foreclosure action on an equity liner account attached to the
property. After months of negotiation, the bank agreed with the Plaintiff and began
drafting funds from the frozen account to pay the equity liner account and halt the
foreclosure on the marital home.   In April 2008, a judge in the Florida Divorce Court

admonished Defendant Gerald Montgomery for his actions and ordered the account unfrozen and the Plaintiff to resume management of the real estate.

170.    In May 2008 when the Plaintiff took over management of the investment real estate in North Carolina several of the properties and the marital home were already in foreclosure. The Plaintiff used marital funds disbursed to her by the Court and borrowed additional funds to reinstate the mortgages. She re-hired Janice Harrelson and contracted with Sequoia Jackson for property management. Defendant Gerald Montgomery refused to pay his share of the mortgages, maintenance, repairs, taxes and insurance. Even after the court ordered him to remove the more expensive forced place insurance on the properties in 2008, he simply ignored the Court's order. The Plaintiff borrowed funds to repair and maintain properties until her funds were exhausted. Nowhere in this country can a property owner expect a property manager to pay all expenses associated with his/her properties with insufficient rental income and no reserve or contribution from the property owners.

Discovery Issues

171.    To expedite the divorce case, the Plaintiff's attorney asked Defendant Gerald Montgomery to sign releases to allow the mortgage companies to provide documents without need for subpoenas. He refused. Attempts to try and convince the Court that the Plaintiff had no need for the mortgage loan files failed. After months of delays, scheduling and health issues and motion hearings, the Court ordered both parties to produce all documents which included the real estate in North Carolina and South Carolina. Defendant Gerald Montgomery signed the releases which the mortgage companies would not honor because of signature differences from the original closing documents. He objected to subpoenas, signed releases, withdrew the releases, granted authorization to speak with the Plaintiff and Janice Harrelson and within hours withdrew those authorizations. The Plaintiff complied with the Court's order and repeatedly reproduced documents which Defendant Gerald Montgomery's attorney accepted and filed in Notices of Production as if provided by her client.

172.    Three different attorneys issued subpoenas for the Plaintiff in 2007, 2008, 2011 and 2012. The Plaintiff was initially forced to rely on incomplete files found in the

home and public records until some banks and lending institutions responded in 2009 and 2012.

173.    Mortgage loan documents received thus far reveal that Defendant Gerald Montgomery had refinanced or "cashed – out" of all of the real estate he co-owned with the Plaintiff and purchased properties with assistance from and in cooperation with his co-conspirators in real estate and mortgage lending. These defendants used their professional affiliations and businesses to legitimize obviously fraudulent mortgage loan transactions to the detriment of the Plaintiff.

174.    The documents received from the subpoenas and public documents reveal the Plaintiff 's driver's license and identifying information were used to refinance real estate in Greensboro, North Carolina that she co-owned with Defendant Gerald Montgomery and to purchase apartments at 906 and 1002 Martin Luther King, Jr. Drive in Greensboro, North Carolina.

Defendants JoAnn Penniegraft Cheek, James Penniegraft
and Oasis Mortgage Company

175.    Several of the properties co-owned by the Plaintiff and Defendant Gerald Montgomery had been financed with PCFS Mortgage Resources until the Defendant refinanced the properties through Oasis Mortgage.   A letter from Michael Maloney, Senior Vice President of PCFS Mortgage Resources to JoAnn Cheek of Oasis Mortgage confirms the mortgage pay-offs to his company on at least four of the properties.  The letter confirms that the loans were in good standing at the time of pay-off.   The letter is sent via fax to Oasis mortgage on July 29, 2003 after loan closing on the same properties on May 23, 2003.  Defendant Gerald Montgomery is copied on the letter sent to a fax number at the home in California.

176.    HUD-1's received from the mortgage companies differ from those provided by Defendant Gerald Montgomery to the Plaintiff to deliver to their accountant.  The mortgage loan documents are riddled with false information from sales documents that list Defendant Gerald Montgomery as a realtor with the Montgomery-Davis Group properties to recording the documents in the county register of deeds office. There are false signatures, addresses, marital status, and closing documents recorded

in the wrong county while others were not recorded at all.  One had two different recorded deeds while another had no recorded deed at all.

177.    Defendant Gerald Montgomery, then living and working in Oakland, California used the California home address, rental property addresses in North Carolina, and a network of post office boxes.   On some Identification Verification forms contained in the mortgage files his Arkansas driver's license is recorded with a California address.

178.    Defendant Gerald Montgomery provided verification of his employment, purchased cashier's check # 5472518 from Bank of America Lawndale Banking Center in the amount of $19,559 to cover closing costs on three of the properties and purchased check number 407172591 at the Bank of America Banking Center Oakland Industrial in California for the amount of $5105 which is made payable to Oasis Mortgage.  There is a handwritten note from Gerald Montgomery to JoAnn Cheek at Oasis Mortgage dated September 26, 2003 containing copies of his UPS check stub, Merrill Lynch Bank account, UPS Stock Activity Report from Mellon Bank, and Bank of America Savings account statements for accounts jointly owned by both he and the Plaintiff.  Defendant Gerald Montgomery signed the closing documents himself or granted power of attorney to Defendant Stanley Montgomery.

179.    Defendant JoAnn Penniegraft Cheek, according to case number 1:03-cr-00454-JAB-12, was arrested on or about November 25, 2003 for conspiring to commit loan, mail, wire, and bank fraud and for making false statements to institutions insured by the Federal Deposit Insurance Corporation including First Union National Bank, Soluna First, First Choice Mortgage Equity, Flick Mortgage Investors, Creve Coeur Mortgage, Option One Mortgage, First Citizens Bank, Union Planters Mortgage, and Argent Mortgage.  She reported to the Bureau of Prisons on or about June 30, 2006. Defendant James Penniegraft, according to case number 1:03-cr-00454-JAB-12, was arrested on or about December 15, 2003 for conspiring to commit loan, mail, wire, and bank fraud and for making false statements to institutions insured by the Federal Deposit Insurance Corporation including First Union National Bank, Soluna First, First Choice Mortgage Equity, Flick Mortgage Investors, Creve Coeur Mortgage, Option One Mortgage, First Citizens Bank, Union Planters Mortgage, and Argent Mortgage.  He reported to the Bureau of Prisons on or about January 6, 2005.  In

2012, as a result of a subpoena to Regions Bank, the Plaintiff received a copy of cancelled check number 1041 in the amount of $1000 written on August 29, 2010 to Defendant James Penniegraft from Defendant Gerald Montgomery's personal bank account.

### Defendant Mark Randolph, Esq.

180.   Defendant Randolph closed loans in the Plaintiff's name with his paralegal Jennifer Dalton notarizing most of the documents.  Signatures resembling the Plaintiff's actual signature appear to be copied from previously executed mortgage loan transactions prior to 2001. Other signatures notarized by Randolph and Dalton claiming to be those of the Plaintiff do not bear any resemblance to her signature.

181.   Defendant Randolph closed on lots on Beaumont Avenue in the name of Defendant Gerald Montgomery.   The mortgage loan documents assert that Defendant Gerald Montgomery's address is in several locations that include the rental property addresses, a location at 623 and 625 Summit Avenue in Greensboro, North Carolina where Defendant Stanley Montgomery operates a coffee house.   According to the Guilford County website there is no property address at 625 Summit Avenue. Defendant Gerald Montgomery is noted as "unmarried" on some of the notarized documents. When the Plaintiff contacted Defendant Randolph in 2007 he claimed he didn't know Defendant Gerald Montgomery was married.  He denied the Plaintiff's rights to closing documents she allegedly signed citing his need to protect Defendant Gerald Montgomery's privacy.  The Plaintiff's attorney subsequently telephoned Defendant Randolph who changed his story asserting that someone claiming to be Defendant Gerald Montgomery's wife was present in his office and presented a South Carolina driver's license for identification. In 2009, Defendant Randolph sent the Plaintiff's attorney a copy of her South Carolina Driver's license allegedly used to identify her at the closings.   The Plaintiff did not have a South Carolina Driver's license when Defendant Randolph closed the mortgage loans.    The Plaintiff requested assistance from the North Carolina Bar.

182.   According to Defendant Randolph, Defendant Jennifer Dalton is now married and working as a paralegal in another North Carolina law firm and known as Jennifer

Dalton Watson. Randolph and Dalton closed the majority of loans on the same day. Defendant Randolph has not responded to subsequent subpoenas for information sent to him in 2011, 2012, and 2013. He used the Plaintiff's name and identifying information to close more than $500,000 in fraudulent mortgage loan transactions.

183.    Defendant Mark Randolph was censured on July 23, 2003 by the Grievance Committee of the North Carolina State Bar "for your violation of the Rules of Professional Conduct." It further states, "The Grievance Committee trusts that you will ponder this censure, recognize the error that you have made, and that you will never again allow yourself to depart from adherence to the high ethical standards of the legal profession. This censure should serve as a strong reminder and inducement for you to weigh carefully in the future your responsibility to the public, your clients, your fellow attorneys and the courts, to the end that you demean yourself as a respected member of the legal profession whose conduct may be relied upon without question."

184.    In 2006, Defendant Randolph appeared before the Disciplinary Hearing Commission of the North Carolina State Bar and entered into an order of discipline by consent for trust account violations. The Disciplinary Hearing Commission suspended his license for two years and stayed the suspension for three years on specified conditions, one of which is "the Defendant will not violate the laws of any state or of the United States." The DHC order requires Mr. Randolph to retain a certified public accountant to provide reports to the State Bar of Mr. Randolph's handling of entrusted funds. Defendant Randolph entered this agreement with the DHC after an admonition in 2002, and a censure in 2003, and while he was refusing to provide the Plaintiff with copies of documents he executed using a stolen driver's license and an accounting for the disbursement of all funds in those real estate closings.

185.    In March 2009, Defendant Randolph stated to the Plaintiff and her attorney that he would mail them a copy of the check showing the disbursement of the balance of funds for 1701 Montford Drive. Instead he sent a copy of the Plaintiff's South Carolina Driver's license with no explanation. The Plaintiff did not have a South Carolina Driver's license when Defendant Randolph refinanced the homes she co-

owned with Defendant Gerald Montgomery. The Plaintiff sought assistance from the North Carolina Bar Association.

### Defendant Armina Swittenberg

186.    Defendant Armina Swittenberg closed on the purchase of five new properties in Greensboro, North Carolina with Oasis Mortgage as the broker. The mortgage files provided by Option One Mortgage contain multiple fraudulent documents. There are letters from Defendant Swittenberg to mortgage companies claiming that Defendant Gerald Montgomery brought checks to closings and she failed to make copies of the checks. In some instances, it appears the same checks were used repeatedly for multiple closings but are insufficient to cover the cost of the closings. There are notes from underwriting and ample closing documents that link the North Carolina defendants in these mortgage loan transactions.

187.    Foreclosure notices sent to Defendant Gerald Montgomery on these properties shortly after they were acquired in 2003 raises questions as to the intent of Defendant Gerald Montgomery. He was in control of the parties' legitimate marital assets worth millions of dollars; yet within three months after closing on several of the mortgages, they were in foreclosure. The Plaintiff did not know the properties had been purchased and would not have known they foreclosed. The scheme was interrupted by the FBI indictments in 2003 which caused Defendant Gerald Montgomery to keep the properties and pay a hefty price to prevent his mortgages from being introduced into the case.

188.    In 2006, the Plaintiff and Janice Harrelson visited the rental properties co-owned by the Plaintiff and Defendant Gerald Montgomery and his newly acquired properties and noted that the condition of the properties was inconsistent with receipts for repairs and maintenance provided by Defendant Gerald Montgomery.

189.    Defendant Armina Swittenberg, as an attorney, knew that the deed of trust must be enjoined by the spouse, if any, of the mortgagor(s) to release statutory marital rights. The circulation of the Plaintiff's expired driver's license was sufficient to overlook the law and encumber the Plaintiff. Defendant Swittenberg was disbarred from practicing law on November 23, 2004. The Disciplinary Hearing Commission of the

North Carolina State Bar issued an order stating, "Disbarment is the only sanction that can adequately protect the public for the following reasons:  (a) An order of discipline less than disbarment would not sufficiently protect the public because Swittenberg committed misdeeds involving moral turpitude and violations of the public trust.  The dishonest and fraudulent conduct, material misrepresentations and misappropriation of money involved surreptitious theft of money belonging to others and which she had a fiduciary obligation to protect.  (b) Entry of an order imposing lesser discipline would fail to acknowledge the seriousness of the offenses that Swittenberg committed and would send the wrong message to attorneys and the public regarding the conduct expected of members of the Bar in North Carolina."  By consent, the Real Estate Law and Commission accepted the permanent surrender of Ms. Swittenberg's broker license effective March 23, 2005.  She is believed to be the same person hosting an online blog with the Empower Network titled "Make Money With Armina."

### Defendants J. Rufus Farrior, Duane Bryant
### and RBC Centura Bank
### 906 and 1002 Martin Luther King, Jr. Drive

190.    Unbeknownst to the Plaintiff on or about June 26, 2003 Defendant Gerald Montgomery purchased eleven apartments at 906 and 1002 Martin Luther King, Jr. Drive in Greensboro, North Carolina from Duane and Wanda Bryant.  J. Rufus Farrior was the closing attorney; Jennifer Dalton was the notary; Montgomery-Davis Group properties was the realtor; title insurance was purchased from Investors Title Insurance Company; and JoAnn Cheek of Oasis Mortgage was the mortgage broker.  The loan was financed in two-parts—a note with RBC Centura Bank and owner financing from the sellers.  Defendant Gerald Montgomery used properties co-owned by the Plaintiff located at 1826 Bothwell Street, 1602 Pichard Street, 1612 Lincoln Street, and 2207 E. Florida Street in Greensboro, North Carolina as collateral.

191.    Defendant Gerald Montgomery gave power of attorney to Defendant Stanley Montgomery to purchase apartments located at located at 906 Martin Luther King Jr. Drive and 1002 Martin Luther King, Jr. Drive in Greensboro, North Carolina.

According to the documents recorded in Guilford County in Book R 5859, Page 2402 the power of attorney is authorized by Gerald Montgomery individually and as member/manager of G.V. Montgomery GSO, LLC. It further states that "the Principal who is the member/manager of G.V. Montgomery GSO, LLC desires to give the Attorney-In-Fact the authority to execute and sign all loan documents including but not limited to, the execution of the Settlement Statement, Note and Deed of Trust, etc. associated with the purchase and collateralization of the aforesaid properties and the loans secured by said properties." The power of attorney terminated on October 31, 2003. Instructions were to mail the document to J. Rufus Farrior after recording.

192.    Defendant Gerald Montgomery signed a loan commitment letter with RBC Centura Bank for $300,000. On or about June 26, 2003. Defendant Gerald Montgomery used J. Rufus Farrior as closing attorney, Defendant Jennifer Dalton as notary, Defendant Montgomery-Davis Group properties as realtor, Defendant Investors Title Insurance Company for title insurance, and Defendant JoAnn Cheek as mortgage broker to purchase an eleven unit apartment complex at 906 and 1002 Martin Luther King, Jr. Drive from attorney Duane Bryant and his wife Wanda Bryant. Promissory notes with RBC Centura Bank and Duane and Wanda Bryant were signed at closing by Defendant Stanley Montgomery.

194.    Two deeds of trust were recorded, one signed by Defendant Stanley Montgomery for G.V. Montgomery, GSO, and a second deed of Trust recorded in Guilford County, North Carolina in Book 5859, Page 2449 with Carolyn Montgomery as Grantor. The Trustee is J. Rufus Farrior, the closing attorney. The document is signed as Carolyn Montgomery in handwriting unrecognizable to the Plaintiff. Defendant Jennifer Dalton is the notary attesting to the signature.

195.    In 2004 Defendant Gerald Montgomery came to Atlantic Beach where Tylor Stanley was completing some renovation work on property co-owned with business partner Catherine Aldridge at 601 31st Avenue. He asked Tylor Stanley if he would bring a crew to Greensboro to renovate some apartments for him. The Plaintiff learned from Defendant Gerald Montgomery that he had allegedly purchased the apartments in the name of his company, Gerald V. Montgomery, GSO in partnership

with the seller and according to him the transaction had cost him nothing other than the agreement to invest in the maintenance and repairs on the properties to take it off of the owners' hands. Defendant Gerald Montgomery did not disclose that he had two mortgage loans on the apartments: one with the sellers Duane and Wanda Bryant and one with RBC Centura Bank, nor did he disclose that the Plaintiff's signature had been used and two different deeds recorded.

196.   In 2006, Janice Harrelson notified the Plaintiff of a letter from RBC Centura informing Defendant Gerald Montgomery that the loan on the apartments was maturing and would not be refinanced. Defendant Gerald Montgomery presented the need for a new loan on the apartments as a matter of him having received only a short term loan on the property along with the promissory note to the Bryants. Bank of America agreed to refinance the property but required the Plaintiff's name on the loan. Defendant Gerald Montgomery allegedly negotiated a settlement with Duane Bryant which paid off the note and the Plaintiff signed the necessary documents for the note with Bank of America.   The Plaintiff found a partial closing package with a Deed to the apartments on which a signature purporting to be hers was notarized by Defendant Jennifer Dalton in the office of J. Rufus Farrior at the original closing. Neither RBC Centura nor Duane Bryant responded to the subpoenas. Attorney Farrior claimed to no longer have the records.

197.   However, Defendant Bryant did take time to communicate a threat to the Plaintiff and Ms. Jackson. Ms. Jackson notified the Greensboro Police Department.   J. Rufus Farrior sent a letter stating they would not or could not respond to the subpoena.

198.   RBC Centura Bank employee Philip Bond explained the fraudulent nature of the mortgage in a telephone call with the Plaintiff and informed her that some bank employees lost their jobs as a result of their involvement with the transaction.

199.   Bank of America agreed to make the loan in the name of Defendant Gerald Montgomery's limited liability company, Gerald V. Montgomery, GSO, with the condition that the Plaintiff sign the documents as co-borrower. The Deed of Trust and Security Agreement is recorded in Guilford County on August 24, 2006 in Book R 6587, page 2970.   After the documents were signed the Plaintiff and Harrelson sought a realtor to sell the property. The Plaintiff presented an offer for a contract

sale which Defendant Gerald Montgomery rejected.   The Plaintiff was presented with another offer from a company that did not have a realtor and stated she would be handling the sale with their attorney.  The Plaintiff presented the information to Bank of America and they agreed to the sale.  Subsequently, the prospective buyer asked the Plaintiff to present to the bank that he had a realtor so the bank would allocate funds for realtor's fees.  The Plaintiff refused to be involved with the transaction.  A few months later Defendant Gerald Montgomery presented the same buyer and the buyer's business partner as realtor.

200.   Bank of America filed a judgment against the Plaintiff in Horry County, South Carolina for $360,000 on November 5, 2010, styled as Bank of America, N.A. v. Carolyn Montgomery, case no. 2010-CP-26-6797 for the full amount of the loan.

201.   On or about May 17, 2012 the original lender, Bankk of America assigned its interest in Deed of  Trust to Equity Resource Partners pursuant to an Assignment of Debt and Lien  recorded in Guilford County on June 19, 2012 in Book R7361, page 1139.

202.   On or about July 11, 2012 Bank of America assigned the debt and lien to Equity Resource Partners as recorded in Guilford County in Book 1139, page 1141.

203.   The Plaintiff was contacted by Unity Builders, a nonprofit organization seeking to purchase the property.  The Plaintiff brought Equity Resource Partners's company, Southwood Development and Unity Builders together for a sale between the two of them that would have relieved the Plaintiff and Defendant Gerald Montgomery of the debt. The company paid the taxes on the property and other city liens.  Defendant Gerald Montgomery through his attorney refused to sign the necessary sale documents.   In frustration, the company's attorney informed the Plaintiff of the difficulty with Defendant Gerald Montgomery's attorney and told her they would proceed with foreclosure on the property and handle the subsequent sale with Unity Builders directly.    The Plaintiff was assured that they would remove the judgment against her.  After repeated requests from the Plaintiff's attorney, Southwood confirmed in an email that it has no intention of enforcing the judgment against the Plaintiff but could not sign the legal documentation necessary to remove it.

204.    On or about October 25, 2012 a Notice of Foreclosure of A Deed of Trust was recorded in Guilford County, Book R7407, page 1377 – 1378 for $360,000 with G.V. Montgomery, GSO, LLC as Grantor, W. Phil Murdock, Jr. and John C. Overfield as Trustees, and Bank of America as Beneficiary.

205.    On or about February 1, 2013, a North Carolina Quit Claim Deed was recorded in Guilford County with Equity Resource Partners-Vinings, LLC as Grantor and Unity Builders as Grantee.

206.    A UCC Financing Statement Amendment was recorded in Guilford County in Book R7443, page 299 – 300 with Debtor G.V. Montgomery GSO, LLC to Bank of America stamped "Terminated." The Plaintiff had to remove this debt through bankruptcy in 2014.

### Stanley Montgomery, Rhonda Montgomery-Davis and The Montgomery-Davis Group

207.    Public records pertaining to The Montgomery-Davis Group indicate the company dissolved on or about April 12, 1999. The company is allowed to conclude its business after dissolution; however, it continued to operate with the same principals and variations on its name with Defendants Gerald Montgomery and Stanley Montgomery as realtors for new real estate transactions in years 2003.

208.    There is an address at 623 Summit Avenue which shows this property granted from the Montgomery-Davis Group to Stanley Montgomery in 2005 for $286,000. The purchase price of the property is $122,400 above the appraised value. The Deed is dated January 17, 2005 and recorded in Guilford County on March 2, 2005 for a sale that occurred on March 15, 2005. The property located at 623 Summit Avenue is recorded in the Guilford County Deed Book 006267, Page No. 01452 on March 15, 2005 according to the files accessed through the Tax Department. Some sales documents on other properties refinanced and or purchased by Defendant Gerald Montgomery show him as a realtor for The Montgomery-Davis Group. Defendant Gerald Montgomery did not have a realtor's license. Based on documents retrieved from the Federal Court under the Freedom of Information Act, the purchase of this property occurred during Defendant Stanley Montgomery's probation period when he

was claiming in reports to the Probation Office that he had no income. Defendant Gerald Montgomery wrote checks to Stanley Montgomery in excess of $100,000 from 2001 to 2005 and tried to force the Plaintiff to include the amount on the 2005 tax return as expenses to their rental property.

209.    Defendant Stanley Montgomery was arrested on or about December 15, 2003 and charged with conspiracy to commit loan, mail, wire and bank fraud in violation of 18 U.S.C.§ 371. According to documents filed with the United States District Court, Middle District of North Carolina, "he was fined $5000 and sentenced to three year probation from December 9, 2004 to December 8, 2007. According to court documents, "he violated the terms of his probation due to his unwillingness to cooperate with the probation officer's instructions. He failed to submit monthly supervision reports on time and failed to provide documentation of income and expenses." Further stated is that "the terms of supervision were modified to include 20 hours of community service work during the term of probation of not less than four hours per month or as directed by the probation officer. All community service work shall be completed within six months of the date of the order. The defendant shall pay any community service fee required as directed by the probation officer." In Defendant Stanley Montgomery's probation documents received under the Freedom of Information Act, it is noted that he opened a café at 623 Summit Avenue, the headquarters for East Coast Protective Services and Southeast Protective Services, with no visible means of income.

210.    Financial reports filed by Defendant Stanley Montgomery as a condition of his probation revealed notes from the probation officer that Defendant Stanley Montgomery, "opened a café with no visible means of income" and noted that Defendant Stanley Montgomery claimed to be receiving the money from his brother." While Defendants Gerald Montgomery and Stanley Montgomery do have another brother, that brother was seeking a loan from Defendant Gerald Montgomery. Checks written to Stanley Montgomery from the marital assets by Defendant Gerald Montgomery exceed $100,000. Both Defendant Gerald Montgomery and Stanley Montgomery tried to force the Plaintiff to falsify tax records to show that the money

was given to Stanley Montgomery for expenses associated with the rental properties. She refused to do it.

211.    Defendant Gerald Montgomery boasts that he owns this property and other properties in Guilford County, North Carolina as a result of such convoluted transactions but aims to conceal them from the Florida Divorce Court. Recorded documents in Guilford County indicate that after foreclosure some of the properties may have transferred back to the Defendant Gerald Montgomery and/or some of his co-conspirators.

212.    Guilford County Register of Deeds, Jeff Thigpen, filed suit in March 2012 against the "numerous banks and loan servicers seeking to clean up the 'mess' created in the County's property records registry." Mr. Thigpen stated, "our office uncovered an abundance of falsified, forged, and fraudulently executed mortgage documents." He asks, "how can we maintain accurate records of title with fraudulent documents?" Mr. Thigpen further states, "when you combine the fraudulent documents with MERS, it is difficult if not impossible to trace title for property. Potential title defects hurt Guilford County homeowners and businesses by impacting property values." The Plaintiff was trying to sort and navigate her way through a mortgage mess that even the County's Register of Deeds acknowledged is problematic because of fraudulent mortgage loan documents. The mortgage loan files contained herein by reference have all of the elements associated with the mortgage meltdown in this country in 2008. There are inflated appraisals, robo-signers, issues with MERS, deeds, and loans. All of these properties ended up as foreclosures not because of insufficient funds but because of Defendant Gerald Montgomery's need to conceal misconduct and criminal activity at the expense of the tenants and the Plaintiff.

213.    Chase, First Citizens Bank, and RBC Centura Bank, Southeast Protection Services and East Coast Protective Services did not respond to the subpoenas. The discovery issues are still a part of the matter pending before the Florida Divorce Court. The companies that did respond to subpoenas provided the Plaintiff with proof that her identifying information was used by Defendant Gerald Montgomery and his co-conspirators in the real estate and mortgage loan industries to facilitate their fraudulent mortgage loan transactions.

214.    The following real estate transaction history is gleaned from a combination of public records, found and stored incomplete files, and scanned files provided by Option One Mortgage and Argent Mortgage in response to the subpoenas.

1701 Montford Drive, Charlotte, North Carolina

215.    On or about October 21, 2002, unbeknownst to the Plaintiff, Defendant Gerald Montgomery gave power of attorney to Defendant Stanley Montgomery as recorded in Guilford County, North Carolina, Book 5647, Pages 644 – 647.

216.    An incomplete closing package found at the Plaintiff's home and conversations between the Plaintiff, her attorney Barry Rigby, and Defendant Randolph revealed that on or about November 27, 2002 unbeknownst to the Plaintiff, Defendants Gerald Montgomery and Stanley Montgomery refinanced a commercial building located at 1701 Montford Drive, Charlotte, North Carolina, a property co-owned with the Plaintiff that was gifted to them in the name of Gerald Montgomery by Catherine Aldridge.    The Plaintiff and Defendant secured a loan on the property on or about 1996.    Unbeknownst to the Plaintiff, Defendant Gerald Montgomery refinanced the loan in 2002 for the amount of $400,000.    The loan from First Citizens Bank was brokered by Oasis Mortgage for a fee of $8,700 and $17,539.55 in closing costs.    The closing attorney is Defendant Mark Randolph and Defendant Jennifer Dalton is the notary.    Stewart Title Company provided title insurance.    The disbursement on the closing statement (HUD-1) to Defendant Gerald Montgomery is $382,460.45 on December 3, 2002.    On December 11, 2002, Randolph wired $249,354.68 to the Plaintiff's and Defendant Gerald Montgomery's joint Bank of America account.    Unaccounted for is a difference of $133,105.77.    Defendant Mark Randolph was subpoenaed by two different attorneys and still has failed to produce documentation showing the disbursement of the remaining funds.    The loan transaction was incorrectly recorded in Guilford County North Carolina showing the property address as Greensboro, North Carolina instead of correctly in Mecklenburg County.    The Defendant Gerald Montgomery's address on the closing documents is noted incorrectly as the property address.

217.     In 2006, Janice Harrelson presented the Plaintiff with a letter from First Citizens Bank's attorney indicating they would not be renewing the loan on the Montford Drive property. The Plaintiff contacted the attorney believing that it was regarding the original loan on the property only to find out that it was the aforementioned loan Defendant Gerald Montgomery brokered through Oasis Mortgage. According to the bank's attorney false information had been presented to the bank which resulted in the bank's decision not to renew the loan. The bank's attorney was limited to what he could divulge about the transaction to the Plaintiff because she was not on the loan; however, he did say, "if it was up to him her husband would be sitting in jail." The Plaintiff presented the letter and details of her conversation with the bank's attorney to Defendant Gerald Montgomery who responded by denying any knowledge of the situation and a declaration to prove it by producing the mortgage loan closing documents. In 2007 and 2009 Defendant Randolph presented to the Plaintiff and her attorney that he was sending a copy of the check showing how he disbursed the remaining funds. Defendant Gerald Montgomery became verbally abusive after repeated requests to produce the documents. Neither Defendants Gerald Montgomery, Randolph, nor First Citizens Bank produced the closing documents and disbursement information.

218.     The Plaintiff and Janice Harrelson handled putting the property on the market for sale and the Plaintiff handled the sale of the property in October 2007 despite Defendant Gerald Montgomery's attempts to sabotage the sale. The proceeds from the sale were deposited into the couple's Wachovia investment account. Defendant Gerald Montgomery in conjunction with Wachovia Bank, now Wells Fargo, transferred $1,000,000 to Goldman Sachs. Goldman Sachs, Wachovia/Wells Fargo, and the investment broker that acquired the file after the death of the original investment broker failed to respond to subpoenas.

### 1612 Lincoln Street, Greensboro, North Carolina

219.     On or about December 14, 2000, the Plaintiff and Defendant Gerald Montgomery refinanced property they owned at 1612 Lincoln Street in Greensboro, North Carolina with Mortgage Portfolio Services into a first mortgage in the amount

of $60,750 and a second mortgage in the amount of $16,200. On January 3, 2001, Carolyn Davidson, Vice President for Mortgage Portfolio Services, a Delaware Corporation, assigned the Deed of Trust and Note for $16,200 to ALH Capital, Inc., a North Carolina Corporation. The document was notarized in Dallas County, Texas.

220.    An incomplete closing package found at the Plaintiff's home in 2007, reveals that on or about May 23, 2003, unbeknownst to the Plaintiff, Defendant Gerald Montgomery, using Defendants JoAnn Cheek and Oasis Mortgage refinanced the property at 1612 Lincoln Street for $149,607 but did not record the transaction in Guilford County, North Carolina. The value of the property is $100,000 greater than the appraised value of the property when it was legitimately refinanced in 2000. There are no maintenance records, comparable properties in the neighborhood, or visible inspection of the property that supports the increased property valuation. Litton Loan Servicing acquired the primary mortgage on the property as Assignments from the refinance in 2000 with Mortgage Portfolio Services to Seasons Mortgage. Subpoenas repeatedly sent to Litton have been ignored. The last response from Litton was on March 1, 2011 which reads: "We object to production of any business records that Litton Loan Servicing may or may not have relating to the subpoena....Please provide proof that Gerald Montgomery received notice." The attorney for the Plaintiff provided proof of such but no information was provided by Litton.

221.    On April 20, 2004, unbeknownst to the Plaintiff, Archibald Williams and Joseph Settle, President and Secretary of ALH Capital respectively, signed an Allonge transferring the Deed and Note for the second mortgage of $16,200 on the 1612 Lincoln Street property to RealECon, a California corporation. The document was notarized by Jill Michelle Thomas in Wake County, North Carolina.

222.    On April 5, 2006, unbeknownst to the Plaintiff, RealECon transferred the Deed and Note for $16,200 to Pontus Capital. The document was executed by Michael Thompson, Vice President, and notarized by Jill Michelle Thomas. The Plaintiff, as court ordered property manager in 2008 made mortgage payments to Litton and Pontus Capital until she could no longer afford to do so.

223.    On or about March 23, 2010, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for 1612 Lincoln Street showing the loan that

was legitimately refinanced in 2000 by the Plaintiff and Gerald Montgomery, but does not show a recorded deed for the refinance Defendant Gerald Montgomery did in 2003 with Oasis Mortgage. The foreclosure report filed in Guilford County, North Carolina indicates $40,000 was received from the foreclosure sale and that $38,744.94 was applied to secured obligations and that the entire amount of the secured obligation was not satisfied.

#1 Pine Ridge Court, Greensboro, North Carolina

224.    An incomplete closing package found at the Plaintiff's home in 2007 reveals that on or about February 22, 2002, unbeknownst to the Plaintiff, Defendant Gerald Montgomery refinanced a single family home they co-owned at #1 Pine Ridge Court in Greensboro, North Carolina. He increased the mortgage on the property from $50,400 to $74,800 with an alleged mortgage payoff at closing to Ocwen Federal for $72,904.86. The mortgage loan file is incomplete. There are two occupancy statements: one that shows the property as his primary residence and another as investment property. One of the loan documents indicates" the loan is a construction loan to the owner and general contractor, Gerald Montgomery." The loan servicer eventually became Washington Mutual (WAMU). A letter dated October 10, 2008 informs the borrower that WAMU has been closed by the Office of Thrift Supervision and the FDIC has been named the Receiver. Subsequently J. P. Morgan Chase Bank became the loan servicer. None of the aforementioned loan holders or servicers responded to subpoenas from the Plaintiff.

225.    On or about August 19, 2009, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for #1 Pine Ridge Court. The refinanced loan amount was $74,800 in 2002 with closing costs of $3026.17. The closing attorney's office was Forquer, Lattimore, & Callaway in Charlotte, North Carolina. The property sold for $75,512.21 at the foreclosure sale on August 4, 2009. The secured obligation is recorded as satisfied.

Real Estate Refinanced by Option One Mortgage

226.    According to documents received in 2009 as a result of subpoenas to Option One Mortgage, on or about May 23, 2003, unbeknownst to the Plaintiff, Defendants

Gerald Montgomery, Stanley Montgomery, JoAnn Cheek, Mark Randolph, Jennifer Dalton, Southeastern Title Agency, and Stewart Title and Guaranty Company participated in the refinance of five (5) single-family homes owned by the Plaintiff and Defendant Gerald Montgomery. Defendant Dalton notarized the alleged signatures of the Plaintiff and falsely attested that the Plaintiff was present and signed the closing documents. The deeds are recorded in Guilford County, North Carolina for the following property addresses:

| 1602 Pichard Street | Book 5832 | Page 958 |
| 2207 East Florida Street | Book 5832 | Page 993 |
| 1622 Pichard Street | Book 5824 | Page 2587 |
| 1508 Dunbar Street | Book 5824 | Page 2574 |
| 1826 Bothwell Street | Book 5832 | Page 980 |

227.    On or about November 12, 2008, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for 1602 Pichard Street. The refinanced loan amount brokered by JoAnn Cheek of Oasis Mortgage from Option One was $70,550 with closing costs of $4,496.95. The foreclosure sale on November 12, 2008 resulted in an upset bid on November 22, 2008 for $62,554.62. The Report of Foreclosure Sale/Resale does not indicate whether the secured obligation was satisfied.

228.    On March 22, 2010, a Special Warranty Deed was prepared by David R. Caudle and recorded in Guilford County on April 12, 2010, in Book 7115, Page 582, transferring the property from Grantors American Home Mortgage Servicing Inc. and Wells Fargo as Trustee for GSAMP Trust 2003-HE2 Mortgage Pass -Through Certificates, Series 2003 – HE2 by its Attorney-in-Fact, American Home Mortgage Servicing Inc. to Grantee SIA Properties, LLC. The property sold for $28,000.

229.    On or about December 12, 2008, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for 2207 East Florida Street. The refinance was for $78,000 in 2003 and the loan amount brokered by Defendant JoAnn Cheek of Oasis Mortgage from Option One was $73,950 with closing costs of $4,607.05. On December 29, 2009, in Deed Book 7092, Page 1767 - 1769, a Special Warranty Deed was prepared by David R. Caudle and recorded in Guilford County transferring the property from Grantors Wells Fargo Bank, NA as Trustee for GSAMP Trust 2003 –

HE2 Mortgage Pass-Through Certificates, Series 2003-HE2 to Grantee Allen Commercial Real Estate, LLC.  American Home Mortgage Servicing Inc. was the Attorney-in-Fact and the property sold for $38,000.

230.    On or about December 12, 2008, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for 1622 Pichard Street.  The purchase price was $78,000 in 2003 and the loan amount brokered by Defendant JoAnn Cheek of Oasis Mortgage from Option One was $66,300 with closing costs of $4144.95.   The property sold at the foreclosure sale on November 25, 2008 for $56,182.92.  The amount applied to the secured obligation was $54,639.10 and was not fully satisfied.

231.    On or about December 16, 2008, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for 1508 Dunbar Street.  The purchase price was $79,000 in 2003 and the loan amount brokered by Defendant JoAnn Cheek of Oasis Mortgage from Option One was $67,150 with closing costs of $4221.47. Defendant Gerald Montgomery purchased cashier's check No. 407172591 at the Bank of America Banking Center Oakland Industrial that was made payable to Oasis Mortgage for $5105.00.  The property sold at foreclosure for $56,959.81.  The entire amount of the secured obligation was not satisfied.

232.    On or about May 28, 2009, the foreclosure sale was held for the property located at 1826 Bothwell Street and netted $55,000.   The refinanced amount was $76,500 in 2003 brokered by Defendant JoAnn Cheek of Oasis Mortgage from Option One with closing costs of $4393.08.  The Final Report and Account of Foreclosure Sale was recorded on June 24, 2009 in Guilford County.   The secured obligation was $53,316.50 at the foreclosure sale on May 28, 2009 and recorded as not fully satisfied.

Cash Real Estate Purchases

Beaumont Avenue Lots, Greensboro, North Carolina

233.    On or about October 22, 2002, unbeknownst to the Plaintiff, Defendant Gerald Montgomery purchased lots 4 and 5, Book 5647, Page 0641-0643 at property addresses 107 and 109 Beaumont Avenue, Greensboro, North Carolina.  Defendant Gerald Montgomery's name is recorded on the North Carolina General Warranty Deed as "unmarried."  The preparer of the document is Defendant Mark Randolph

and the document is notarized by Defendant Jennifer Dalton.  There is a Deed of Trust recorded in Guilford County Book 5647, Page 0648 and a Deed of Trust recorded in Guilford County Plat Book 38, Page 89 referencing lots 4 and 5 in which Defendant Gerald Montgomery is the "Grantor," Lola Amaker is "Beneficiary" and the "Trustee" is Defendant Mark Randolph.  The document states that "the Grantor is indebted to the Beneficiary in the principal sum of $4500.  The final due date for payment of said Promissory Note, if not sooner paid is November 1, 2003"

234.    On or about January 15, 2003, unbeknownst to the Plaintiff, Defendant Gerald Montgomery purchased Lot #3 on Beaumont Avenue in Greensboro, North Carolina. The property is recorded in Plat Book 38, Page 89 and Book 5728, Pages 0699-0701. The Grantors are Ora Morehead and Sadie Brown.   The Grantee is Gerald Montgomery whose address is listed at 623 Summit Avenue, Greensboro, North Carolina at a time when his legal residence was not in the state of North Carolina. The realtor in this transaction is Defendant Stanley Montgomery and the closing attorney is Defendant Mark Randolph.

235.    On or about January 15, 2003, unbeknownst to the Plaintiff, Defendant Gerald Montgomery purchased Lot #2 on Beaumont Avenue in Greensboro, North Carolina. The property is recorded in Plat Book 38, Page 89 and Book 5728, Pages 0702-0704. The Grantor is Lola Amaker and the Grantee is Gerald Montgomery, this time with his address listed as 625 Summit Avenue, Greensboro.   The realtor in this transaction is Defendant Stanley Montgomery and the closing attorney is Defendant Mark Randolph.

236.    Defendants Gerald Montgomery and Stanley Montgomery subdivided the Beaumont Avenue lots into six lots.   Once acquired, the expenses for the property taxes and other expenses associated with the lots were paid from the Plaintiff's marital assets and represented on filings of joint tax returns.

237.    The Florida Divorce Court ordered the lots appraised.  The Plaintiff, as property manager, complied with the Court's order.  The outstanding debt to McNairy and Associates for appraisal of the lots on November 4, 2008 was charged to the Plaintiff in the amount of $2400 and submitted to the law firm of Tuggle Duggins in Greensboro, North Carolina for collection as of July 26, 2012.

Real Estate Purchases Financed by Argent Mortgage

238.    According to documents received in 2009 as a result of subpoenas to Argent Mortgage, the Plaintiff learned that Defendant Gerald Montgomery, on or about October 17, 2003, acquired five (5) single family homes in Greensboro, North Carolina with himself as "Gerald Montgomery-Davis Group Properties as realtor, Defendant Stanley Montgomery, Montgomery-Davis Group, JoAnn Cheek of Oasis Mortgage as mortgage broker, Armina Swittenberg as closing attorney, and Commonwealth Land and Title Insurance Company, also known as Attorney's Title Company, a division of United General Title. The loans were financed by Argent Mortgage and recorded in Guilford County as follows.

| 1714 Pichard Street | Book 5965 | Page 2388 |
| Re-recorded/modified | Book 5965 | Page 2409 |
| 3712 Nash Street | Book 5965 | Page 2337 |
| 1624 Pichard Street | Book 5965 | Page 2414 |
| 2206 Tuscaloosa Street | Book 5965 | Page 2310 |
| Corrected | Book 6894 | Page 404 |
| 2109 Windsor Street | Book 5965 | Page 2361 |

239.    Foreclosure notices on the above properties were sent to Defendant Gerald Montgomery on December 23, 2003. Defendant Gerald Montgomery wrote checks for mortgage payments on the property from marital assets to bring the mortgages current. Foreclosure notices on the same properties were sent to Defendant Gerald Montgomery dated June 3, 2004. Payments were made from marital assets to bring the mortgages current. The mortgages were delinquent when the Plaintiff assumed the court-ordered management of the properties in May 2008 from Defendant Gerald Montgomery. The Plaintiff borrowed funds from Catherine Aldridge to bring the mortgages current when Defendant Gerald Montgomery refused to use the marital assets under his control to bring the mortgages current.

240.    On or about October 3, 2008, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for 1714 Pichard Street. The purchase price was $79,000 in 2003 and the loan amount brokered between Defendant Cheek and Argent

Mortgage was $71,000 with closing costs of $10,690.20. The secured obligation of $76,911.06 was paid from the foreclosure sale on September 16, 2008. The property sold for $78,543.14. The deficiency has not yet been determined.

241.    On or about September 10, 2009, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for 3712 Nash Street. The purchase price was $79,000 in 2003 and the loan amount brokered by Defendant JoAnn Cheek of Oasis Mortgage from Argent Mortgage was $71,100 with closing costs of $10,862.09. The property sold at the foreclosure sale on August 27, 2009 $25,000. The secured obligation was not fully satisfied.

242.    On or about October 1, 2009, the Final Report and Account of Foreclosure Sale was recorded in Guilford County for 1624 Pichard Street. The purchase price was $77,000 in 2003 and the loan amount brokered by Defendant JoAnn Cheek of Oasis Mortgage from Argent Mortgage was $69,300 with closing costs of $10,632.83. The property sold for $31,500 at the foreclosure sale on August 27, 2009. The secured obligation was not fully satisfied.

243.    On April 7, 2008, a Replacement Deed of Trust to correct legal description was recorded in Guilford County on May 23, 2008 in Book 6894, Page 404 by Grantors Duane K. Bryant, Attorney-in-Fact, and Gerald V. Montgomery to Grantees Argent Mortgage Company, LLC and Swittenberg and Associates as Trustee. On December 1, 2009, a Trustee's Deed was prepared by Shapiro and Ingle, LLP and recorded in Guilford County on December 4, 2009 in Book 7082, page 748, with Grantors Grady I. Ingle as Trustee, Jim Joyner and Gerald V. Montgomery to Grantee Jim Joyner, Scherm Investments, LLC, and Swittenberg and Associates as Trustee for the property located at 2206 Tuscaloosa Street.

244.    On or about December 4, 2009, the property was foreclosed and conveyed to Scherm Investments.

245.    On or about December 8, 2009, the Final Report and Account of Foreclosure Sale was recorded in Guilford County. The alleged purchase price was $77,000 in 2003 and the loan amount brokered by Defendant JoAnn Cheek of Oasis Mortgage from Argent Mortgage was $69,300 with closing costs of $10,699.67. The property

sold for $22,602 at the foreclosure sale on August 27, 2009. The secured obligation was not fully satisfied.

246.    On March 23, 2010, in Book 7109, Page 2960, a Substitute Trustee's Deed was recorded in Guilford County on March 26, 2010 for property located at 2109 Windsor Street from Grantors Steven A. Lamb, Swittenberg & Associates, Swittenberg & Associates Inv, Ind and Gerald Montgomery to Grantees Deutsche Bank National Trust Co., Deutsche Bank National Trust Co, INV and IND, J & A Associates, LLC, and Swittenberg & Associates.

247.    On or about March 23, 2010, the Final Report and Account of Foreclosure Sale was recorded in Guilford County. The purchase price was $77,000 in 2003 and the loan amount brokered by Defendant JoAnn Cheek of Oasis Mortgage from Argent Mortgage was $69,300 with closing costs of $3235.73. The property sold for $28,477.01 and $26,176.36 was applied to the secured obligation which was not fully satisfied. On April 13, 2010 the foreclosure document was recorded in Guilford County.

1626 Pichard Street, Greensboro, North Carolina

248.    In July 2003, Defendant Gerald Montgomery informed the Plaintiff that he was building a house at 1626 Pichard Street, Greensboro, North Carolina that he pre-sold to a qualified buyer through Defendant Stanley Montgomery. In August 2003 the Plaintiff took the children in the Atlantic Beach Summer Youth Program to the National Black Theater Festival in Winston-Salem, North Carolina. On the way back she stopped in Greensboro to see the house. In November 2003 she was told by Defendant Gerald Montgomery that the buyer made a large furniture purchase and was no longer a qualified buyer. Janice Harrelson was house-hunting. The Plaintiff relayed the story about the house to her. Ms. Harrelson went to her lender, qualified and purchased the house.

249.    On or about December 17, 2003, unbeknownst to the Plaintiff, Defendant Gerald Montgomery gave power of attorney to Stanley Montgomery to handle closing on the house being purchased by Janice Harrelson at 1626 Pichard Street. The document is recorded in Guilford County, North Carolina in Book 6002, Pages 2046-2048. Janice Harrelson presented to the Plaintiff that she was surprised to see Stanley Montgomery

at her closing since the Plaintiff presented to her that Defendant Gerald Montgomery was having the closing documents shipped to him in California for his signature.

250.    A few days later, Harrelson called the Plaintiff and told her that she had read in a local newspaper that Defendant Stanley Montgomery had been indicted along with the people from Oasis Mortgage in a mortgage fraud scheme. The Plaintiff called Defendant Gerald Montgomery in California and asked him about the mortgage fraud scheme involving his brother. He told her "the FBI had mistakenly given his brother's name to the newspaper after they questioned him about his relationship with Oasis Mortgage but had already apologized to him for the mistake."

South Carolina Real Estate Transactions
330 51st Avenue, North Myrtle Beach

251.    In 1996, the Plaintiff and Defendant Gerald Montgomery purchased a channel house from Catherine Aldridge at 330 51st Avenue in the Cherry Grove section of North Myrtle Beach. They renovated it and sold it in October 2004.

901 West Port Drive, North Myrtle Beach

252.    In 2001, the Plaintiff and Defendant purchased a condo at Carolina Keyes in North Myrtle Beach. The parties sold the condo in August 2007. Defendant Gerald Montgomery mailed proceeds from closing to the Plaintiff to cover marital debts. She put the money into her personal bank account and paid marital debts as agreed. On October 4, 2007 the Plaintiff notified Defendant Gerald Montgomery that their accountant, John Fitzgerald, had completed the delinquent tax returns. Less than an hour later she received a telephone call from Bank of America informing her that Defendant Gerald Montgomery had reported the check she deposited as stolen from him and the bank froze her account. Bank of America's investigator and a representative from the corporate office clarified the situation sufficiently to pay joint debts from the funds. In April 2008, the Florida divorce ordered the account unfrozen and reprimanded the Defendant for his actions.

55

Atlantic Beach Oceanfront Lots

253.    On or about June 20, 1998 the Plaintiff and Defendant Gerald Montgomery
purchased three oceanfront lots in Atlantic Beach from James Kingsland who
financed the lots with a five year balloon which Catherine Aldridge loaned funds for
pay-off on January 17, 2003. Aldridge and Ingland had purchased two oceanfront
lots of their own. The Plaintiff and Defendant Gerald Montgomery, Catherine
Aldridge and Hannah Ingland sold their oceanfront lots on July 13, 2005.

254.    The Plaintiff raised the issue of divorce and Defendant Gerald Montgomery
went to Bank of America and transferred the proceeds from the sale of the lots into
the business account that was solely in his name. Two bankers at Bank of America
who had visited them in their home and set up the investment account refused to
participate in the scheme and informed him that under Florida law it was illegal for
them to help conceal assets. Defendant Gerald Montgomery transferred the money
back to the account on Valentine's Day and used the gesture to try and convince the
Plaintiff to remain in the marriage.

South Carolina Properties Purchased

by/for Tyson Beach Group, LLC

255.    On or about February 16, 2001, the Plaintiff, Defendant Gerald Montgomery,
Catherine Aldridge and Hannah Ingland formed a limited liability company, the
Tyson Beach Group. The agreement was for the Plaintiff and Defendant Gerald
Montgomery to match Aldridge's and Ingland's investment in the company for fifty
percent ownership once the Plaintiff was no longer working for the town of Atlantic
Beach. Aldridge and Ingland opened the Tyson Beach Group bank account on
December 20, 2001 with $300,000. They were the only cash investors in the
company until December 4, 2002 when Defendant Gerald Montgomery deposited
$73.59 into the account. Defendant Gerald Montgomery became the member-
manager for the corporation and was given check signing authority. He was living
and working in California and agreed to send a signature stamp for Aldridge and
Ingland to conduct the company's business but at each meeting he would claim that
he forgot to get the stamp and would ask Aldridge, Ingland or the Plaintiff, at the last

minute, to sign the company's checks for him.  The Tyson Beach Group received deposits from the marital assets of the Plaintiff and Defendant Gerald Montgomery on December 4, 2002 for $73.59.  In 2003 Defendant Gerald Montgomery made five deposits totaling $15,800 and a deposit on February 4, 2005 for $2847.  The next deposit was made by the Plaintiff and Defendant Gerald Montgomery on August 1, 2005 in the amount of $175,000.   Their total cash investment in the company was $559,012.75 which does not match or exceed Aldridge and Ingland's investment and left the Plaintiff and Defendant Gerald Montgomery with 25% ownership in the company based on the default calculation for ownership and their actual cash contribution.

## 601 31st Avenue South, Atlantic Beach

256.       On or about February 28, 2001 the company purchased a motel in Atlantic Beach at 601 31st Avenue.   Defendant Gerald Montgomery put the mortgage loan in his name to meet the closing deadline which would require more time to qualify the company for the mortgage.  Defendant Gerald Montgomery assured the Plaintiff, Catherine Aldridge and Hannah Ingland that he would handle transferring the property into the company's name after closing.  The Tyson Beach Group made the payments on the note to BB&T.  In 2004, the Tyson Beach Group demolished the motel and renovated the property into a restaurant.  Each time the loan was up for renewal Defendant Gerald Montgomery would wait until the last minute and the company would have no choice but to renew it in his name.

257.       When the mortgage loan on the property at 601 31st Avenue came up for renewal in 2008, the Plaintiff, Catherine Aldridge and Hannah Ingland insisted the Note be transferred from Defendant Gerald Montgomery's name to the company's name as originally agreed.   Defendant Gerald Montgomery was presented with a letter from the bank requiring his signature authorizing the bank to discuss the note with the Plaintiff, Catherine Aldridge or Hannah Ingland to allow them to proceed with changing the Note.  Defendant Gerald Montgomery refused to sign the authorization letter.  Aldridge and Ingland refused to make any further payments on the property until it was in the company's name.   The bank representative and the

company's attorney made several appeals to Defendant Gerald Montgomery to sign the documents to allow Aldridge and Ingland to protect their investment in the property. BB&T filed a judgment on March 17, 2010 for $110,527.93. Defendant Gerald Montgomery boasted that he forced the property into foreclosure. On the day before the scheduled foreclosure sale, the Tyson Beach Group's attorney negotiated the sale of the property to Nora Lener's Restaurant. BB&T Bank filed a Satisfaction of Judgment in Horry County on April 19, 2010.

413 30th Avenue South, Atlantic Beach

258. On or about October 28, 2002, the Tyson Beach Group purchased a four unit apartment house located at 413 30th Avenue South, Atlantic Beach, South Carolina from Harold Livingston for $126,325. The Tyson Beach Group had loaned Mr. Livingston $38,500 which was deducted from the asking price leaving a balance of $87,825 which is reflected on the HUD-1 as the sales price. Defendant Gerald Montgomery handled this transaction for the Tyson Beach Group and signed the closing documents in the law office of Thompson Henry in Myrtle Beach. In 2007, the Plaintiff and business partners learned that Defendant Gerald Montgomery had refinanced the property and took cash out without their knowledge.

259. On or about July 12, 2004, unbeknownst to the Plaintiff and business partners Catherine Aldridge and Hannah Ingland, Defendant Gerald Montgomery made, executed and delivered a Note promising to pay Chase Manhattan Mortgage Corporation the sum of $140,000 with interest at 8.5% per annum on a mortgage filed on July 12, 2004 covering real property located in Horry County at 413 30th Avenue, North Myrtle Beach, South Carolina as recorded in Book 3711 at Page 0772. The property is actually located in Atlantic Beach, South Carolina. The property belonged to the Tyson Beach Group but was originally acquired in the name of Defendant Gerald Montgomery with funds from Catherine Aldridge and Hannah Ingland. The company had boarded up the building and determined it would make no plans for the renovation until the Plaintiff was no longer town manager due to the complaint filed with DHEC while 601 31st Avenue was undergoing renovations and articles that

appeared in the Sun News raising the issue of conflict of interest for the Plaintiff as town manager to own property in Atlantic Beach.

260.    During the refinance of 413 30th Avenue, Defendant Gerald Montgomery informed the Plaintiff and TBG members that he had to have the boards removed from the building and someone living in the property to maintain the insurance on it. He had the boards removed, rented furniture, and instead of leasing the property as was the understanding, shortly afterwards he re removed the furniture and resealed the building.  Later the Plaintiff and business partners would learn that he had refinanced the property.

261.    Price is a general contractor and had agreed to renovate the property at 413 30th Avenue in Atlantic Beach.  His wife, Rev. Windy Price was pastor of the church located across the street from the property had plans to move her family to Atlantic Beach and run for a seat on the town council in the November 2009 election.  By agreement with the Plaintiff, the Price family would be allowed to occupy one of the four apartments.

262.    Defendant William Booker used his position as town manager to prevent the Plaintiff and Prices from repairing and ultimately occupying 413 30th Avenue.  As soon as the Plaintiff and Darnell Price set foot on the property to assess the repairs and begin work that did not require a building permit, the police chief, Randy Rizzo arrived and informed the Plaintiff that Defendant Booker was on the telephone with Defendant Gerald Montgomery and that Booker directed him to remove her from the property.  The Plaintiff presented the police chief with her court order from Florida to manage the property.  The Plaintiff asked the police chief to provide the directive from De On or about August 25, 2009, Defendant Booker presented Ordinance # 8-2009 for the town council's approval.  It is "an ordinance requiring utility companies to have signed verification from the town of Atlantic Beach that all code requirements have been met before providing utility services to properties within the town of Atlantic Beach." Defendants Evans, Isom, and Taylor passed this ordinance which targeted and was used only against the Plaintiff's property and Rev. Price's church. After passage of the ordinance, on or about August 27, 2009, Defendant Booker sent

a letter to Santee Cooper directing them to shut the power off at 413 30th Avenue which they did.

263.    On or about September 2, 2009, Defendant Gerald Montgomery's divorce attorney, Dorothy McMichen sent a letter to William Booker stating, "Mr. Montgomery has requested that I send correspondence stating that he understands that Carolyn Montgomery has proceeded with doing work on the property located at 413 30th Avenue South, Atlantic Beach, South Carolina and that this building has been condemned." McMichen sends a copy of the Florida court's order authorizing the Plaintiff to manage the North Carolina and South Carolina properties. Despite the court's order she adds, "Please be advised that Mr. Montgomery has not authorized any work to be done on said property and will not be responsible for any renovations done on said property." During the reproduction of documents ordered by the Florida Court the Plaintiff discovered this letter.

264.    On or about September 17, 2009 Defendant Booker convened a meeting of the town's property maintenance board and asked them to condemn the property at 413 30th Avenue which they did. Defendant served notice of the meeting of the town's property maintenance board on the Plaintiff the day after the meeting was held. There was no income coming in from the four apartments and the property subsequently went into foreclosure and was sold in 2010.

265.    In 2013 the Plaintiff learned that the new owner of the 413 30th Avenue property went to see Defendant Booker on the day that she purchased the house at the foreclosure sale and was told that the property at 413 30th Avenue was not condemned.

266.    The police chief left, returned later, and told the Plaintiff that Defendant Booker was working with Defendant Gerald Montgomery to condemn the property and that until such time he had directed him to ticket Darnell Price daily and any other people on the property. Darnell Price received tickets for doing work on the property that did not require a building permit.

### Defendant Thomas Behan

267.    Defendant Thomas Behan, in his capacity as an expert witness for Defendant Gerald Montgomery and tax preparer argues that the investment properties were loss as a direct result of the Plaintiff's actions; however, he ignores the fact that Defendant Montgomery managed the properties from March 2001 to December 2005 and again from March 2007 to May 2008.  He fails to acknowledge the mortgage loan documents that clearly show that Defendant Gerald Montgomery refinanced all of the existing marital properties and purchased new properties that clearly affected the income and expenses associated with the properties and the overall balance sheet. Equally important is the fact that when the Plaintiff managed the properties prior to 2001, with Janice Harrelson in 2006 and by court order in 2008 there are solid financial records.  The only questionable information is that which was provided by Defendant Gerald Montgomery when the Plaintiff was not yet acquainted with his untrustworthiness.

268.    Defendant Behan admitted that he directed Defendant Gerald Montgomery to sell over $1 million dollars in United Parcel Service stock knowing that this asset was under the jurisdiction of the Florida court by way of the Administrative Order.  Such a decision was outside of the scope of Behan's authority and would have required an order from the Court.  Defendant Behan, in his capacity as an accountant, filed individual tax returns for Defendant Gerald Montgomery on February 16, 2012 for tax years 2008, 2009, 2010, and 2011 which include expenses and losses on real estate.

### Public Officials Affiliated with South Carolina State Government

269.    The State Ethics Commission has a key role in determining the eligibility of candidates for office in the state of South Carolina.  Additionally ethics charges against any public employee, candidate, or office holder has long term ramifications beyond generating negative publicity and tarnishing reputations; the cost of defending one's self against alleged violations is prohibitive and limits the pool of potential candidates for elective office; therefore, probable cause and fines should not be

adjudicated on the basis of personal vendettas, political favors, or incomplete investigations.

270.    In Morris's 2009 article Defendant Hayden gave a false account of what transpired at the Plaintiff's 2004 ethics hearing. Defendant Hayden put forth that he was offended by an alleged "loophole" in the law that allowed the Plaintiff to function in a volunteer capacity for the town in her first year as town manager that put her in a unique position and left the Commission unable to enforce the state's ethics laws against her. The timing of the article and comments from Defendants Gerald Montgomery and Charles Williams suggest more than mere coincidence.

271.    Defendant Hayden used his official capacity and the media opportunity to present his personal opinion regarding the Plaintiff's 2004 case in which he insinuates she is guilty of an ethics violation though the case was dismissed by the State Ethics Commission. He fails to state that the State Ethics Commission had a detailed response to the charges against the Plaintiff in which her attorneys argued that she did not violate state ethics laws in the matter of the Tyson Beach Group loan. The town had an attorney who advised and guided the town council and manager through the entire loan process. The Plaintiff nor Defendant Gerald Montgomery had money in the Tyson Beach Group bank account when the money was loaned to save the town of Atlantic Beach from bankruptcy. The Plaintiff had limited her interest and involvement in the Tyson Beach Group to her marital interest and provided that information in writing to the Atlantic Beach town council as required by the town's attorney. The Plaintiff complied with the public notice of a potential conflict in an open council meeting and complied with the additional directives from the town attorney to satisfy the requirements of the state's ethics laws to assure an arms-length transaction.   Defendant Hayden ignored the facts as is his pattern relative to the Plaintiff. The alleged "loophole" in the law spared him and the State Ethics Commission the expense of holding a hearing in which the obvious facts and laws of the state were overlooked in pursuit of persecution.

272.    In 2001, while secretary of the Atlantic Beach Landowners Association, Defendant Williams was introduced to the Plaintiff as a candidate for the job of town manager of Atlantic Beach. The town was in turmoil in a dispute with then town

manager, Linda Angus and on the brink of bankruptcy. Williams was presented as having an accounting issue trailing him that led to his separation from a previous governmental position. The Plaintiff and other landowners chose not to support him for the position in Atlantic Beach, a town overwhelmed by its own issues.

273.    In 2005, a newly seated town Council hired Defendant Williams, then a consultant for the Municipal Association of South Carolina, as town manager of Atlantic Beach. Defendant Taylor, then on friendly terms with the Plaintiff, informed her that jokes were being made by Williams and her fellow council members about how to force the Plaintiff to work for Williams who needed help with Bikefest. Williams sent the Plaintiff a letter directing her to return to work. The Plaintiff and Williams exchanged words after she informed him that she had a contract with the town of Atlantic Beach to work for them only in the capacity of town manager. The Plaintiff explained that the only business between her and the town relative to her employment contract was the town's need to comply with the terms of the out-clause. She directed Williams to send all future correspondence to her attorney.

274.    In April 2005 the Plaintiff returned home to Florida.

275.    In or around October 2005, the town council terminated Defendant Williams from the position of town manager and hired Marcia Conner.

276.    In 2006 the Plaintiff became an officer in the Tyson Beach Group. The members of the company voted to file a lawsuit against the town for failure to repay the money it loaned the town in 2001. Defendant Gerald Montgomery and Hannah Ingland were the most vocal advocates for immediate filing of the lawsuit while the Plaintiff and Aldridge argued to give the town more time. The Plaintiff filed the lawsuit in the matter of the Tyson Beach Group loan.

277.    The Plaintiff filed a lawsuit against the town in 2008 for breach of her employment contract. The Plaintiff's contract included the facts that she volunteered for the town for one year as town manager and worked without pay the second year which was to be compensated at the end of her tenure with the town whether by resignation or termination. The town began paying the Plaintiff a salary in year three of her four years as town manager. The Plaintiff's action were a part of the Atlantic

Beach Landowners Association's efforts to right-size the town government and prevent its impending bankruptcy.

278. In 2007, the Plaintiff learned of a questionable transaction involving Williams's use of personal funds to facilitate the sale of a lot owned by the town. He allegedly completed the transaction using his personal funds in an alleged loan to the town without the authorization of Council. The Plaintiff filed a complaint with the State Ethics Commission.

279. In April 2008, the town failed to respond to the lawsuits filed by the Plaintiff and the attorney filed for default judgments. The town's mayor and manager were indicted for misappropriation of funds and the town council re-hired Williams per agreement with the Municipal Association of South Carolina. Williams filed to dismiss the default judgments announcing prior to the hearing in a council meeting that he had talked to the judge to have the case re-instated. On the day of the hearing the judge admonished Atlantic Beach for its failure to attend to its legal cases in a timely manner and re-instated the cases.

280. In September 2008, the Plaintiff, along with other members of the Atlantic Beach Landowners Association attended a town council meeting. During the time for public comment, the Plaintiff challenged Defendant Williams on comments he made dismissing the town's need to complete its state required audits.

281. In 2010, Williams testified as a witness against the Plaintiff at the trial on her employment contract. The Court ruled in the Plaintiff's favor and ordered a judgment against the town of the payment plus interest. This court order is the basis for the claim against the Plaintiff that she violated ethics laws and participated in a decision affecting her.

282. On July 8, 2011, the Plaintiff was sent an email and a letter from Karen Wiggins, a staff member with the State Ethics Commission directing her to file a Statement of Economic Interest within ten days of receipt of the email. The Plaintiff consulted her attorney and contacted the State Ethics Commission and explained to Ms. Wiggins that according to her attorney filing a Statement of Economic Interest would be premature and unlawful since the Plaintiff, an appellant in the 2009 election case was required to wait until after the appeal process pending in the South Carolina

Supreme Court had expired before taking the oath of office and officially becoming a member of the Atlantic Beach town council. The deadline for the Respondents to appeal the Supreme Court's decision to seat the Plaintiff and Windy Price expired without an appeal.

283.    The Plaintiff was sworn in and on or about July 23, 2011 and attended her first town council meeting as a member of the Atlantic Beach town council on July 26, 2011. The Council voted to hire Benny Webb as interim town manager and Carolyn Hills as town attorney. The town voted to put the Plaintiff and Webb on check-signing for the town of Atlantic Beach--one elected official and one staff member, usually the mayor and the town manager, but the mayor was on probation and council was advised not to nominate the mayor for the responsibility. The resolution was signed by the council members and filed in the town's Book of Resolutions. On July 27, 2011, the Plaintiff and Webb hand delivered the town's check signing resolution to the National Bank of South Carolina where they signed the Bank's resolution and signature cards presented by the bank's officer.

284.    On Saturday, August 6, 2011, the town council held a special meeting to specifically address the town's finances. The Council had invited one certified public accountant and one accountant to the meeting. Council, by majority vote, gave the interim town manager a directive to address the town's debts based on the recommendations of the accountants. The directive was for the town manager to prioritize the town's debts and pay those first that are required by federal or state statute; second to pay court-ordered debts, and third to pay debts to stop interest from accruing, and fourth to create payment plans for all outstanding debts. He was advised to take these actions by adjusting line items on the budget and if the adjustments exceeded the budget; he would need to present Council with a budget amendment to maintain the legally required balanced budget. The Plaintiff and Councilwoman Price were appointed to the town's Finance Committee. The Plaintiff did not participate in discussions relative to matters involving her specific cases against the town.

285.    The town's largest single debt was the court-ordered judgment to the Plaintiff from her breach of employment contract which was still accruing interest in 2011.

The settlement negotiated by Webb with the Plaintiff's attorney included the judgment from the breach of employment contract lawsuit and attorney's fees ordered by the South Carolina Supreme Court in the election case. The Plaintiff's attorney took the position with the manager that he was unwilling to negotiate with the town to stop the interest from accruing until the town showed good faith effort, entered into a payment plan, and began making the payments. The decision of Defendants Evans, Isom, and Taylor to omit the judgment from the budget was illegal. The state law requires the town to account for all of its debts in its annual budget, a necessary step to presenting a balanced budget. Council's directive to the manager would have corrected the previous council's violation of the law without need for a budget amendment. A specific amount had been allocated in the budget for deficit reduction and a rainy day fund. The council and manager had within its authority the right to establish payment plans to satisfy its debts and stop interest from accruing.

286.    On or about November 2011 the Plaintiff and Councilwoman Price asked interim town manager Webb for his resignation after a series of events at Town Hall; one involving a town employee, a state employee on assignment to train the town's court personnel, and a citizen. The Plaintiff and Price told Webb that though they voted to hire him based on his familiarity with the town, law enforcement experience and degree in public administration, they could no longer support him for the job. Webb responded with a memo to the Plaintiff accusing her of interfering with the daily operation of town hall and a request to Price's husband to evict the Plaintiff from their home. The Price's refused. The matter of the town manager's resignation became an issue for the town council. Defendant Jake Evans was quoted in the newspaper as saying he was not going to vote to get rid of the manager because "she" referring to the Plaintiff doesn't like him. Councilwoman Price wrote a memo to SLED seeking their assistance with the harassment issues.

287.    Webb resigned in March 2012. He is one of the witnesses for the State Ethics Commission. He alleges in his statement that the Plaintiff forced him to write checks to her. Webb is a retired SLED agent and an experienced investigator with full comprehension of the law. In the matter of Webb's harassment of the state employee, the Plaintiff penned the letter of apology. In the matter with the citizen Webb was

charged with assault and battery. The case was heard in the Horry County Circuit Court and upheld on appeal.

288.    The Plaintiff's attorney is the Plaintiff's witness to the fact that he and not the Plaintiff negotiated the repayment terms with the interim town manager based on the court-ordered judgment from the Plaintiff's breach of employment contract lawsuit. Calvin Blanton is one of the Plaintiff's witnesses. He was interviewed by Defendant Bagnall who submitted a summary of his interview. Blanton can attest to the facts regarding the town's check signing policy, check writing procedures, and relevant information Defendant Bagnall did not include in his report.

289.    Blanton, initially served as the town's finance manager reporting to Webb. He prepared the payroll in conjunction with a payroll service and wrote checks as agreed upon with the town manager. The town manager prepared some of the checks by hand during the transition period from the old staff to the new staff and prior to Blanton's hiring. After the finance manager was hired the checks were printed from Quickbooks. The town manager presented the checks to the Plaintiff for her signature until the Plaintiff provided the finance manager with her signature stamp. The only departure from the town's customary practice was the town manager coming to the Plaintiff's residence at odd hours of the night requesting her presence at town hall to sign checks. The Plaintiff halted the practice and in a meeting with the interim town manager and the finance manager it was agreed that two days per month was sufficient for check signing duties for which the Plaintiff would make herself or her signature stamp available.

290.    On April 15, 2012 the Plaintiff filed her Statement of Economic Interest for 2012. It is recorded on the print-out from the State Ethics Commission as Amendment I for year 2011. The Plaintiff did not have an amendment for year 2011. On September 18, 2012, the Plaintiff received correspondence from the State Ethics Commission alleging it was the second notice that she failed to file the SEI for 2012. The Plaintiff contacted the State Ethics Commission and told them that in the presence of witnesses she filed the 2012 Statement of Economic Interest on April 15, 2012. She was told by the staff member that they had two different usernames and passwords for the Plaintiff and she had filed under the wrong username. On or about

November 26, 2012 the State Ethics Commission filed Complaint C2013 – 076 alleging the Plaintiff failed to file a 2012 Statement of Economic Interest.

291. On November 29, 2012, the Plaintiff received another notice from the State Ethics Commission stating that she failed to file the SEI for 2012.

292. The Plaintiff's attorney filed the Statement of Economic Interest in the presence of the Plaintiff under a new username while being guided by a Commission staff member on December 12, 2012.

293. On January 4, 2013, the Plaintiff received a notice from the State Ethics Commission stating, "It is time to file the 2013 Statement of Economic Interests. The Plaintiff filed her 2013 Statement of Economic Interest on February 1, 2013 at 2:43 p.m. in the presence of witnesses. On April 4, 2013, Kathy Wiggins, a staff member at the State Ethics Commission assisted the Plaintiff.

294. The Plaintiff received a letter from Defendant Hayden dated January 31, 2013 stating that "The State Ethics Commission considered the complaint at its meeting held on January 16, 2013, and determined that probable cause exists to support the alleged violation." The hearing was scheduled for March 20, 2013 at 12:30 p.m. The Plaintiff received a letter from Cathy Hazelwood, General Counsel and Deputy Director for the State Ethics Commission dated March 14, 2013 stating, "You have not received timely notice for your hearing. Your complaint hearing is now scheduled for July 17, 2013 at 12:30 at the address above." On May 22, 2013, the Plaintiff received a letter from Ms. Hazelwood stating, "Your hearing is scheduled for July 17, 2013 at 2:00. The Plaintiff's attorney spoke to Defendant Bagnall about the hearing on July 17, 2013 and was told it was only a hearing for him to present his information to the staff and was not the actual hearing on the matter. On October 9, 2013, the Plaintiff was informed that she owed $5300 plus interests for failure to file the 2012 Statement of Economic Interests and that the judgment would be filed with the clerk's office in the county of her residence.

295. The Plaintiff ran uncontested for town council in the scheduled November 5, 2013 election. The town's official Municipal Election Commission declared both the Plaintiff and Windy Price winners of the election. The Plaintiff filed her Campaign Disclosure Report on November 10, 2013 at 6:20 p.m. Defendants Evans, Isom, and

Taylor seated a new municipal election commission led by Defendant Joe Montgomery. The illegally seated MEC ignored the November 5, 2013 election, set a new election date without following legal procedures to do so, held an election and announced that the brother of Defendant Jake Evans was the winner along with Kenneth McLaurin.

296.    On March 29, 2014 at 3:34 p.m. the Plaintiff filed a Statement of Economic Interest for 2014 in the presence of witnesses.

297.    On August 5, 2014, the Plaintiff received a letter from the State Ethics Commission informing her that she was fined $100 for failure to file her Campaign Disclosure Form for the November 5, 2013 election. She mailed a United States Postal Money Order No. 22185382847 for $100 marked "under protest" to the State Ethics Commission on August 26, 2014.

Defendants Evans, Hayden, Bagnall, and State Ethics Commission

Ethics Complaints

298.    On or about June 25, 2012, the Plaintiff joined council members in a vote for Resolution No. 2 - 2012 the basis for its ethics complaint against Defendant Jake Evans. The State Ethics Commission lists Calvin Blanton as the complainant. Defendant Evans voted in favor of exchanging a lot owned by the Town of Atlantic Beach with his mother thus giving his mother the more expensive lot and the town the less expensive lot without any compensation to the town for the lost value and without disclosing the relationship and potential conflict prior to the vote as required by ethics laws. Defendants Evans, Taylor, and Isom voted to approve the land transfer. Defendant Evans' boasted in council meetings that it would have passed even if he had not voted. Defendant Evans quoted Defendant Hayden as having said, "the complaint did not matter because his mother was not a family member under state ethics laws." Defendant Hayden did not describe this matter of law that allowed Defendant Evans to vote on a matter involving his mother as a "loophole" as he did with the Plaintiff. The Ethics Commission dismissed the complaint against Defendant Evans.

299.    Defendant Evans retaliated by filing two ethics complaints against the Plaintiff, both reprising the Tyson Beach Group loan, the matter from the 2003 ethics complaint. At a town council meeting in 2012, Defendant Jake Evans acknowledged that the Tyson Beach Group debt was owed but added he "wanted to make sure the Plaintiff didn't get the money." Calvin Blanton posed the question to Council that if they knew the debt was owed was it not fraudulent to present to the Court that no such debt was owed. Defendants Evans and Taylor did not respond.

300.    Evans argued that Defendant Gerald Montgomery, as sole member/manager of the Tyson Beach Group was the only one who could file the lawsuit against the town and that Gerald Montgomery had told them the town did not have to repay the loan. Blanton directed them to get Defendant Gerald Montgomery to provide a document including that information. The money in the Tyson Beach Group bank account at the time the loan was made belonged to the business partners, Catherine Aldridge and Hannah Ingland. Aldridge sold her interest in the company to Ingland. Defendant Gerald Montgomery knew that his and the Plaintiff's marital interest in the Tyson Beach Group was under the jurisdiction of the Florida Divorce Court.

301.    In 2012, after months of discussion, the Atlantic Beach town council directed interim town manager Calvin Blanton to settle the matter of the Tyson Beach Group loan.

302.    In advance of a scheduled hearing in the Horry County Circuit Court on the Tyson Beach Group loan, Defendant Jake Evans sent a letter dated April 19, 2012 to Chief Judge Steven John informing him that an ethics complaint was being filed against the Plaintiff and asking him not to hear the Tyson Beach Group case until after the ethics hearing.

303.    Defendant Jake Evans filed Complaint C2012 – 124 against the Plaintiff on May 22, 2012 alleging that she voted on matters pertaining to her when she voted to hire the law firm of Boykin and Davis as town attorney for the town of Atlantic Beach and reprising his argument in favor of Defendant Gerald Montgomery's ownership of the Tyson Beach Group.

304.    The South Carolina Supreme Court has repeatedly ruled in favor of the right of government officials to exercise their duty to vote on all matters before them. State

ethics laws provide procedures for public officials to follow where there is a conflict of interest. The Plaintiff did not have a conflict of interest. Boykin nor his firm has represented the Plaintiff as a private citizen, only in matters involving the town and her capacity as a town official. Defendant Evans supplied the State Ethics Commission with a document containing false claims against the Plaintiff. He included a payroll check on which the finance manager with the Plaintiff's authorization used her signature stamp to sign the town's payroll checks. He fails to include the memo from the manager explaining there is only one signature because the other authorized signer had resigned and was no longer a town employee.

305.    The State Ethics Commission dismissed the complaint on September 11, 2012 and included in their Statement of Facts, "The Respondent's [Plaintiff] ex-husband is the sole owner of the Tyson Beach Group. The lawsuit has not been settled. The Respondent had no pending lawsuit against the town in 2011 and she has no interest in the Tyson Beach Group therefore had no standing to file a suit on its behalf." In this statement, Defendant Hayden comments on a matter that is not within the jurisdiction of the State Ethics Commission and lends the Commission's authority to Defendant Gerald Montgomery in his attempt to confuse and convolute the matters within the Florida Divorce Court and to Defendant Jake Evans for use in the hearings on the matter in the Horry County Circuit Court.

306.    In October 2012 Blanton settled the case with the Plaintiff's attorney, he negotiated a reduction of almost $100,000 for the town and payment terms. Defendants Evans, Taylor, and then Mayor Retha Pierce claimed that no such directive was given to Blanton. The dispute was heard in the Horry County Circuit Court. After hearing testimony and reviewing the evidence, the Court upheld the signed agreement between the parties.

307.    On or about February 25, 2013 Defendant Jake Evans filed Complaint C2013 – 107, a complaint which he alleges the Plaintiff signed checks to herself without authorization from the town council. The Plaintiff, as one of two signers on town checks signed all checks presented by the manager and/or finance manager when presented for her signature including checks made payable to her, a policy of the town of Atlantic Beach since the 1980's.

308. Defendant Bagnall interviewed the Plaintiff in her attorney's office on or about June 6, 2013. He informed the Plaintiff that he had been an investigator for the State Attorney General's office and his experience as an investigator was needed to handle her case. Defendant Bagnall admitted to the Plaintiff and her attorney that he had not conducted a complete investigation into the matter because he could not read the town's voluminous minutes and did not have all of the town's relevant minutes, ordinances, or resolutions. He could not direct the Plaintiff to minutes in which she allegedly participated in decisions pertaining to her employment contract or the Tyson Beach Group loan. The Plaintiff's attorney sent Defendant Bagnall a copy of the letter in which he arranged and handled the matter of payments to the Plaintiff with the town's interim town manager, Benny Webb.

309. The Plaintiff and her attorney were waiting for Defendant Bagnall to contact them with a date for him to review town council minutes and ordinances with them when she received a ruling from the State Ethics Commission signed by Defendant Hayden on or about July 24, 2013 charging her with ten counts of violating state ethics laws. Count one alleges that she used her office for gain and counts two through ten allege that she participated in a governmental decision affecting her. This case is in effect the same case dismissed by the State Ethics Commission in 2004 and 2012 and ruled on by the Horry County Circuit Court in 2010, 2013, and 2014 and a continuation of the numerous attempts by the Defendants Evans, Hayden and Bagnall to discredit the Plaintiff, prevent her from holding office in the Town of Atlantic Beach and prevent her or the business partner from receiving the court ordered payments and negotiated settlement.

310. The Plaintiff's South Carolina attorney in the matter of the settlement agreement and the breach of employment contract issued subpoenas to the town and discovered that among those documents was an audit commissioned by Defendant William Booker on behalf of the Town of Atlantic Beach. The audit was prepared by Hamilton, McKinney and Moss, Certified Public Accountants for the period July 1, 2010 through June 30, 2012 and a draft presented to the town on October 16, 2013. The firm states that their engagement is "to vouch the validity of the town's bank statement balances, deposits and credits, and disbursements and debits from July 1,

2010 through June 30, 2012. Of the two findings they report "the bank balances, deposits and credits, and withdrawals and debits presented on Exhibit A – Summary of Bank Account Activity agree with the respective banks statements as to validity, accuracy, and completeness. As to the second finding which specifically addresses the Plaintiff's settlement, they finding is that "the assumed monthly payment amount presented on Exhibit A – Summary of Bank Account Activity agrees with the amount of monthly payment terms outlined in the Consent Order of Settlement for Civil Action No.: 2010-CP-26-11971R without exception.

311.    In 2013 there was another attempt to remove the Plaintiff from the Atlantic Beach town council based on allegations that she did not reside in Atlantic Beach. She was notified of a complaint and hearing filed with the Horry County Election Commission in which she could be stripped of her voting rights and seat on the town council.

312.    In a letter dated April 23, 2013, Defendant Hayden sent a letter to the Plaintiff's attorney stating that he had sent a complaint notice to the Plaintiff by certified mail and that it was returned to his office on April 1, 2013 as unclaimed. He further states that the notice was sent via first class mail on April 1, 2013 and was returned again with an insufficient address on April 17, 2013. The Plaintiff had also received several calls from the investigator alleging the same. The Plaintiff took the mail with the envelopes that she received from the State Ethics Commission to her attorney's office. Some of the correspondence had come to her via regular mail to the street address and the post office box, and some by certified mail and regular mail to the street address. The Plaintiff called Defendant Bagnall and informed him that she was holding in her hand four envelopes from the State Ethics Commission dated March 10, 2013 (certified and tagged as unclaimed), March 13, 2013, March 14, 2013, and May 22, 2013, all addressed to the physical address and all three hand delivered from the mailbox outside of the apartment. She asked him to explain what they meant by they did not have an address for her.  A copy of the certified envelopes from the State Ethics Commission tagged "unclaimed" by the United States Postal Service was circulated in town as evidence that the Plaintiff did not reside in the town.

313.    On or about October 24, 2013 Defendant Jake Evans delivered the State Ethics Commission's envelopes into the hearing room at the Horry County Election Commission and handed them off to the Complainant in the presence of witnesses before joining Defendants Isom, and Taylor in the audience. The Horry County Election Commission's hearing panel went into closed session to discuss the matter of taking away the voting rights and council seats of the Plaintiff and Windy Price based on a complaint that they were not residents of Atlantic Beach. The Plaintiff and Price had allowed a reporter from one of the local news channels to walk through their home with his cameras to see where they lived. In previous election hearing transcripts, Defendant Jake Evans had queried the Plaintiff about the family's sleeping arrangements in the apartment. The hearing panel informed the public that this was their first hearing to take away a person's voting rights and elective office. They addressed the lack of evidence and dismissed the case against the Plaintiff and Price. This was essentially the same case ruled on by the South Carolina Supreme Court in the 2009 town council election. Defendant Hayden in collusion with Defendant Evans attempted to influence the Horry County Election Commission by manufacturing and providing false evidence against the Plaintiff using the legitimacy of the State Ethics Commission.

314.    The Plaintiff filed a motion in the Horry County Circuit Court protesting the illegal election. She withdrew her motion with prejudice in April 2014. The cost of pursuing litigation, the emotional distress, the intensity of the harassment campaign, the number of attorneys and public officials involved in the scheme and the failure of law enforcement to investigate the matter of election fraud in Atlantic Beach emboldens the violators and puts the Plaintiff, the Price family, and other citizens at risk.

315.    On July 1, 2014, the Plaintiff was served with a lawsuit filed by Webb in the Horry County Magistrate Court alleging that she owed him money. The Plaintiff does not owe Webb money and there is no agreement between the two of them stating such. Both the Plaintiff and the sheriff's deputy mistakenly calculated the deadline for response as August 1, 2014. The Plaintiff arrived to file the response and learned that she was one day late. The Plaintiff appealed but the Court upheld the default

judgment. The Plaintiff's bankruptcy attorney amended the bankruptcy petition to include the default judgment.

316.    Contrary to Webb's allegation documents reveal it is actually he that owes money to the Plaintiff and Defendant Gerald Montgomery, a matter addressed in a separate lawsuit.

### Public Officials Affiliated
### with Town of Atlantic Beach Government

317.    The Atlantic Beach defendants did not have a legal role in the matter between the divorcing parties. They chose to insert themselves into a personal matter between the Plaintiff and Defendant Gerald Montgomery and to expend the taxpayers' money to prevent payment of the court-ordered judgments from the Plaintiff's breach of employment contract lawsuit, Supreme Court ordered attorney's fees, and settlement agreement to repay the Tyson Beach Group loan. The Atlantic Beach co-defendants would partner with Defendant Gerald Montgomery to deny the Plaintiff's access to funds and advance the harassment campaign to guarantee her silence on matters involving the town. She had contacted law enforcement regarding several of the cases involving Atlantic Beach officials and was still pursuing the matter of the fraudulent mortgage loans.

318.    The town's mortgage loan fraud scheme dates back to the 1980's and was before the Horry County Master-in-Equity in 2010, 2013 and 2014 based on a lawsuit filed by Willa Dewitt in 2007. Ms. Dewitt is one of the alleged lenders of money to the town, the widow of the attorney who worked as the town's attorney when the original scheme was devised. According to the town's documents, the late Mr. Dewitt's wife and father-in-law were among those who allegedly loaned money to the town. Ms. Dewitt is alleging that the town failed to repay her and her father. In August 2014, the Plaintiff filed a motion before the Horry County Court asking to intervene in the case to present the facts surrounding the repayment of the loans. The details of the Atlantic Beach mortgage fraud scheme is contained in an investigative report presented to the FBI, Attorney General of the state of South Carolina, other law enforcement and public officials and is contained herein by reference.

319.    The former Attorney General reviewed the mortgage loan documents with the
Plaintiff and an Atlantic Beach Police officer and stated "it's clearly fraud" but took
no action.

320.    The case was presented to the FBI.  In 2011, the Plaintiff spoke to the agent that
handled the case file.  He corroborated the story Defendant Charlene Taylor relayed
to the Plaintiff.  The retired agent said he thought the matter was resolved when he
visited Atlantic Beach town manager Marcia Conner and informed her that the debts
were paid and named the town officials that needed to repay the town.

321.    In 2010, Defendants Jake Evans, Charlene Taylor, and Josephine Isom as the
majority town council members claimed there was no evidence to defend the town's
position that all mortgagees had been repaid and allowed the case to move forward to
the Master-In-Equity for settlement which would benefit all of the conspirators.

322.    In 2010 the Plaintiff went to a town council meeting and gave the council
members a compact disc containing a copy of her scanned file of the mortgage loan
documents and repayment history that had been audited by two different accountants.
The Plaintiff reminded them that Defendant Charlene Taylor stored copies of these
same documents in her home along with other citizens, police officers, state and
county officials in anticipation of a claim that no proof of payment records existed.
The auditors revealed that the town never produced a bank account in which the
alleged loaned funds were deposited.

323.    In 2012, the Master-in-Equity stated in court that former town council member
Gloria Lance agreed to repay the town.  There is no evidence of such repayment to
date.

324.    The Dewitt case is still pending before the Horry County Master-in-Equity.

325.    In 2012, the town's municipal judge attempted to move forward with arrest
warrants in the matter but the Horry County Police Chief directed officers not to sign
the arrest warrants in the matter of the mortgage loans.

326.    Defendant Gerald Montgomery continued his harassment campaign enlisting
Defendants Evans, Taylor, Isom, Pertell, William Booker, and Joe Montgomery.
Defendant Joe Montgomery was boasting to the Defendant's acquaintances and
friends that he was on the telephone with Defendant Gerald Montgomery several

times daily which was confirmed by an Atlantic Beach police officer and staff member. According to them the topic was her marriage, condemnation of the property at 413 30th Avenue and ways to force her out of town.

327.    On August 21, 2012, Defendant Joe Montgomery wrote a letter to town attorneys, Charles Boykin, Kenneth Davis, and town manager Calvin Blanton in which he stated, "we have been informed that a settlement is in the making between the Plaintiff, Carolyn Montgomery's attorney and the mysterious town attorney." Mr. Montgomery went on to make false assertions in the letter and issued warnings to the town's attorneys. He copied Dan Choate of the South Carolina Ethics Commission.

328.    On December 9, 2012, Defendant Joe Montgomery wrote a letter to Calvin Blanton and the Plaintiff's attorney, Charles Jordan, asking them not to honor the consent order for the settlement agreement to the Plaintiff signed by the judge on October 29, 2012. The letter was co-signed by James B. Dewitt, Kenneth McLaurin, and Jannie Isom.

329.    Defendant Gerald Montgomery submitted a witness list to the Florida Court that included the name of the town's former mayor, Irene Armstrong, sister of Defendant Jake Evans and Defendant Charlene Taylor.

330.    Darnell Price was on the Plaintiff's witness list in the Florida Court.

331.    Mr. Price was arrested for allegedly saying to someone "I'm going to knock your head off." Defendant Booker sat next to the Plaintiff at the hearing in the Atlantic Beach Community Center before Judge Bradley Smith, an appointee of Defendants Evans, Isom, and Taylor. Mr. Price had been incarcerated for fourteen days prior to the hearing and at the hearing he was ordered to wear a tracking bracelet for ten months. After sentencing Mr. Price, Judge Smith called Rev. Price to come forward and asked her how she could sign the complaint for her husband. She offered that she had power of attorney and her husband's authorization to do so while he was incarcerated. Judge Smith directed Atlantic Beach police chief, Eric Lewis to start an investigation on Rev. Price for forgery and falsifying documents. On appeal, a Horry County Circuit Court judge ordered the removal of Mr. Price's tracking device after expressing disgust at something so outrageous and beyond what the state statute allowed for such an infraction. Rev. Windy Price filed a complaint against Judge

Smith with the Office of Disciplinary Council.  In 2014 she received a letter from ODC informing her that her complaint was valid and disciplinary action would be taken.

332.    Darnell Price and his wife, Rev. Windy Price allowed the Plaintiff to move into their home.  Defendant Joe Montgomery told them that "if they would put the Plaintiff out of their house they would not have any trouble with town officials."

333.    During the Plaintiff's tenure as town manager, Defendant Vernessa Pertell worked as the town's judge.  Defendant Pertell informed friends and associates of the Plaintiff that she had opened a business in partnership with Defendant Gerald Montgomery.  She is identified as Vice President of Operations for Defendant Gerald Montgomery's business, East Coast Protective Services.  She opened a business, East Coast Hospitality Staffing.  During the same time period, Defendants Evans, Isom, and Taylor appointed Defendant Pertell as a judge for the town of Atlantic Beach in a volunteer capacity to serve along with the town's judge who was appointed and paid to do the job.  The town consists of four streets.

334.    Personal information such as medical records, credit reports, and leases for individuals with whom the Plaintiff lived or was associated with were accessed, copied and distributed throughout the town.   In 2012 Pertell announced that Southeast Protective Services/East Coast Protective Services had been contracted to provide services at the Democratic National Convention in Charlotte and boasted of a higher level of security clearance and access to information.

335.    Defendant Pertell, in her capacity as an Atlantic Beach judge, signed warrants against Darnell Price for an alleged business license violation on a business that he did not own and he was arrested.

336.    The Plaintiff on several occasions had court dates in Florida and in a South Carolina court or a hearing before the State Ethics Commission scheduled on or about the same date which made it impossible to attend both.

337.    The Plaintiff, on behalf of the Tyson Beach Group, opened the restaurant at 601 31st Avenue in Atlantic Beach.  The police began coming to the restaurant and harassing people.   A customer parked his vehicles inside the fenced parking lot of the restaurant and the Atlantic Beach police entered the property and towed the

vehicle from the property claiming the vehicle was inoperative and abandoned. The customer and the Plaintiff retrieved the vehicles the next day from the towing service, drove them back to the restaurant and parked them.

338.    Defendant Gerald Montgomery tried to force the foreclosure of the restaurant property. The new owners acquired the property from the bank. They decided to close the family-styled restaurant to avoid any further harassment of the Plaintiff.

339.    The Plaintiff was attending church at the Atlantic Beach Christian Methodist Episcopal Church where Windy Price is the pastor. Defendant William Booker directed Santee Cooper, the electric company, to shut off electricity to the church. On a Wednesday night when the Plaintiff and others were in church for mid-week prayer service, Defendant Booker sent the police to shut down the church for an alleged code violation. The police threatened to arrest all people who did not leave the church. The police arrested Rev. Price and her husband, Darnell Price. Defendant Booker directed the police to condemn the church and it was taped off as a crime scene. It was later revealed that no such code violation existed. No one in the town had ever received such treatment for an "actual" code violation. The church remained closed for [number of months]. Defendants Booker and the police harassed them during protests that included Bishop Thomas Hoyt and Bishop [name] Bryant from the national Methodist churches.

340.    In November 2009, the Plaintiff and Rev. Price won seats on the Atlantic Beach town council as write-in candidates. Defendant Lynda Booker, a Municipal Election Commissioner, wife of Defendant William Booker, appointed by Defendants Evans, Isom, and Taylor, used her position to deny their seats on council which resulted in appeals to the Circuit Court and the South Carolina Supreme Court. The Supreme Court upheld the election of the Plaintiff and Rev. Windy Price in Opinion No. 26996 heard April 5, 2011 filed July 7, 2011 and is incorporated herein by reference. In the Supreme Court's order there is a recapitulation of the events including the attempts to prevent the Plaintiff and Windy Price from renovating and moving into the property located at 413 30th Avenue in Atlantic Beach.

341.    Defendant Pertell presided in tandem with the town's judge at a hearing for two of the Plaintiff's associates, Joshua Caplan and Margie Smith. Ms. Smith had just

arrived home from the hospital with a two-week old baby when she was arrested. The charges against Caplan were also dropped when reviewed by a Horry County Circuit Court judge. The Plaintiff contacted her attorney and he pleaded for bond and Ms. Smith's release.

342.    Patricia Bellamy was on the Plaintiff's witness list and cooking in the restaurant at 601 31st Avenue. She had knowledge of Defendant Gerald Montgomery's refinance of the property located at 413 30th Avenue in 2004 when he pretended to be staging the house to obtain insurance. Bellamy was also present at 413 30th Avenue when the police arrived and directed the Plaintiff and Price to leave the property. The Atlantic Beach Police Department arrested Ms. Bellamy for allegedly stealing cabinets that were given to her by the company handling demolition of the Housing Authority apartments, her former residence in Atlantic Beach. The Horry County Circuit Court dismissed all of the charges against Ms. Bellamy.

343.    The Plaintiff was driving Catherine Aldridge's vehicle. The vehicle was registered to Ms. Aldridge at her home in North Carolina. In 2010, the Plaintiff was stopped by an Atlantic Beach police officer around 7:00 p.m. and told that she had failed to pay property taxes for the vehicle to be in Horry County. The Plaintiff attempted to show the officer the receipt for payment of vehicle taxes. The officer went back to his car and returned saying, "he had just gotten off the telephone with the Horry County tax office and they confirmed the taxes were unpaid, and wrote her a ticket. A Horry County Magistrate Court judge set all of the cases involving Cole and her associates for the same day and dropped all of the fraudulent charges against them.

344.    Defendants Taylor and Pertell directed the police to remove the Plaintiff and Rev. Windy Price from a public meeting without any provocation. The Plaintiff and Price simply went into the community center and sat down to listen to the Gullah-Geechee Festival planning committee. Police Chief Eric Lewis escorted them to the door telling them they weren't welcome at the meeting.

345.    Defendant Isom's adult son, angry after his mother had been served with documents, came to town hall and when the Plaintiff opened the door, hit her with the

package that was delivered to his mother. He is enjoined from further contact with her. The matter has not yet gone to trial.

346.    Postings appeared on the internet with derogatory comments taunting the Plaintiff about her divorce, finances, and the foreclosure on the house in Florida. Authorship of a letter purported to be Cole's biography was credited to Horry County Concerned Citizens and circulated. The author/s claimed to have intimate knowledge of the Plaintiff's private life with her former husband and made allegations of affairs with prominent men and a female friend in Atlantic Beach, South Carolina. The Plaintiff was contacted by a media outlet, attorneys, government officials, and colleagues who received the letter in the mail.

347.    Defendant Evans'verbal abuse of the Plaintiff became a staple of Executive Session at town council meetings with such comments as, "You don't have a mama. Your mama is dead. You ain't got no money. You broke. You ain't got no family." Evans' abuse of the Plaintiff had nothing to do with the town's official business.

348.    On or about July 29, 2014 the Governor of South Carolina visited Atlantic Beach to discuss Bikefest. A news outlet asked the Plaintiff if she would give an interview. She agreed to do so. While the reporter was setting up for the interview, Defendant Jake Evans' sister, Jane Evans came over to the Plaintiff and in the presence of witnesses started telling her how "they" kept her off of the town council and how they are going to run her out of town." Alienation and isolation is not a new strategy in warfare. The Plaintiff and her friends were aware of the Defendants' strategy and the harm it was causing the Plaintiff and themselves still they chose not to abandon her.

349.    In July 2014 a witness observed Christoper Clagg a town volunteer deposit tapes from town council meetings and documents into a trash bin. The citizen contacted other citizens who took pictures of the items and removed them from the trash bin. The most recent auditor's report cites the lack of records and missing documents as the reason for his inability to confirm transactions and issue an opinion on the town's finances.

## ARGUMENT

350.    After years of harassment, degradation, repeated assaults and witnessing the limitations of law enforcement, the abuse in the legal system, and the breakdown of the judicial system in county and state courts and a broadening conspiracy that made a private divorce a public matter, the Plaintiff is forced to defend her rights.  The civil rights violations in this case are shrouded in criminal misconduct and far exceed the scope of the Florida Divorce Court, state and county courts and the South Carolina State Ethics Commission.  This case exemplifies the extremes to which one man and his conspirators went to conceal their misconduct, obstruct justice, bully the Plaintiff into silence, and deny her right to hold public office.

351.    The relationship between the Plaintiff and the Defendant Gerald Montgomery and their business partners is historically one in which the Plaintiff and their business partners found themselves in clean up mode after Defendant Gerald Montgomery's unilateral decision-making and failure to  address the consequences of those decisions negatively impacted their business ventures.  The partners stopped accepting personnel recommendations from him after his brother, a former financial broker abandoned the business partner's account at Lincoln Life without any notice prior to leaving the company, and after a UPS co-worker's son was hired as broker to manage an investment account at Merrill Lynch and was subsequently indicted for stealing the funds.  The Plaintiff and Aldridge testified in the matter before the New York State Grand Jury in 2001 after allowing Defendant Gerald Montgomery to beg off citing the consequences such an appearance would have for him on his job.  The Grand Jury handed down an indictment and the broker was sentenced to twelve years in prison for his use of his clients' accounts in a Ponzi scheme.  This pattern of cleaning up after Defendant Gerald Montgomery continued long after the Plaintiff filed for divorce in 2006.

352.    Aldridge filed a lawsuit against the Plaintiff and Defendant in Orlando, Florida on November 20, 2008.  Aldridge died December 26, 2011.  Ingland noticed the Florida Court on June 4, 2013 that she had accepted a settlement from the Plaintiff of $425,438 consisting of cash payments, furniture, vehicle, and all proceeds from the Plaintiff's employment breach of contract lawsuit settlement and Tyson Beach Group

loan settlement from the Town of Atlantic Beach. Defendant Gerald Montgomery received notice of this settlement and knowing that the Plaintiff had resolved the issue and given up the proceeds to the settlements was still insufficient to stop him and his co-conspirators from harassing her. She filed bankruptcy in 2014. She has sought assistance from federal and state law enforcement agencies, a statement often repeated in the most tragic of domestic violence cases.

353.   Defendant Behan had access to all of the mortgage loan documents and reports provided by the Plaintiff during her court-ordered property management period from May 2008 to the present. Defendant Behan, claims to have calculated a valuation on the properties from the prior years' tax returns that led to his conclusion that the Plaintiff should be held liable for all of the couple's investment properties except those paid for in cash--six vacant lots in Greensboro, North Carolina and a second home in Florida in which Defendant Gerald Montgomery currently resides. Defendant Behan is not at the table as an expert witness but as an accomplice. He has been paid handsomely for using his accounting skills and practice to conceal facts from the IRS and the Florida Divorce court to the detriment of the Plaintiff.

354.   Defendant Gerald Montgomery, after participating in and profiting from an illegal mortgage fraud scheme is now before the Florida Court asking the Court to help him in his campaign to further victimize the Plaintiff as is his co-conspirators in Atlantic Beach before the Horry County Master-in-Equity asking for the Court's blessings in their mortgage fraud scheme. They may consider their actions shrewd and savvy but it is nothing more than a brazen affront and mockery of the judicial system enabled by officers of the Court. The initial mortgage documents are the basis for criminal misconduct compounded by more criminal acts to violate those who refuse to participate, even in the conspiracy of silence.

355.   The Plaintiff agreed to manage the couples' properties which is contained in the Court's order as of 2008 to access information that would resolve issues pertaining to the mortgages and equitable distribution of assets. Still the Defendant Gerald Montgomery found ways to avoid, delay, and prevent discovery.

356.   The Plaintiff reproduced hard copies of the documents in 2012 and scanned files in 2013 that covered the reproduction of documents since 2007. Still Defendant Gerald

Montgomery's attorney still claimed she had not received the documents. The Plaintiff's attorney issued new subpoenas and re-issued subpoenas. Several of the mortgage companies, attorneys, and lending institutions still have yet to respond to the subpoenas.

357.    Defendant Hayden has repeatedly filed ethics charges against the Plaintiff alleging that she ran for office and failed to file Statements of Economic Interest and Campaign Disclosure Forms, participated in decisions that affect her and wrote checks to herself in some illegal and unethical manner. The Plaintiff's attorney presented the facts surrounding each charge to the State Ethics Commission and each time the charges were dismissed until Defendant Bagnall presented false information to the Plaintiff's attorney to prevent them from attending the hearing. In the Plaintiff's absence she was fined for an ethics violation that she did not commit and continues to be harassed by Defendants Hayden and Defendant Bagnall.

358.    Defendant Hayden's aggression toward the Plaintiff and his determination to label and stigmatize her aids his conspirators in Atlantic Beach and provides documents for Defendant Gerald Montgomery to use against the Plaintiff in the Florida divorce court, and to distribute among his family, friends in his ongoing attempts to justify his abuse and violence towards her. Defendant Hayden ignored the laws, authority and jurisdiction of the municipal council, the circuit court, and the South Carolina Supreme Court in his attempts to use the State Ethics Commission to unseat the Plaintiff after the Supreme Court seated her on the Atlantic Beach town council in 2011. His current charge is another attempt to overrule and circumvent the Horry County Circuit Court's decision to uphold the settlement agreement.

359.    The breach of her employment contract, the South Supreme Court ordered attorney's fees and the settlement to repay the loan to the Tyson Beach Group are now contained in what is now referred to as the "global" settlement.

360.    The Plaintiff was made an authorized signer on town checks by a vote of the town council. The town council gave a directive to its manager to stop its debts from accruing, prioritize them and to work out payment plans. The manager negotiated a payment plan with the Plaintiff's attorney that was to begin immediately based on the breach of employment judgment. The State Ethics Commission has no jurisdiction

in the matter. The previous town council allocated funds for debt reduction in its budget and included a "rainy day fund." Defendants Hayden and Bagnall attempt to strip the town council of its right to govern its affairs when it voted to pursue a strategy for debt reduction that would focus on federal and state mandated obligations and court ordered settlements. The council's decision does not require authorization from the State Ethics Commission. The Plaintiff did not participate in discussions specific to her case and Defendant Bagnall could not show her legitimate minutes of the town of Atlantic Beach to corroborate his alleged findings. Among the trash Defendant Clagg tossed into the dumpster are hard copies of minutes and tapes Defendant Bagnall should have reviewed as a part of his ethics investigation against the Plaintiff.

361.    A thorough investigation into the town's check signing policy and procedures would reveal checks signed by the town's authorized check signers to themselves date as far back as the 1980's and as recent as 2014. Defendants Hayden and Bagnall, to make their case against the Plaintiff, use checks prepared by the town's accountant and interim town manager to pay the amount the Plaintiff's attorney negotiated with the interim manager as payments toward the breach of employment contract judgment and the Supreme Court order. They ignore the payroll checks for Council's stipend the Plaintiff is also required to sign to herself to create the false perception that the Plaintiff was committing an illegal act instead of signing checks according to town policy as check signers before and since her have been required to do. Defendant Jake Evans was fully aware of the town's check signing policy dating back to the 1980's when his family members as town council members signed the mortgage loan repayment checks to themselves. If Defendant Bagnall had taken time to review the mortgage loan repayment checks, the town's current payroll checks, and the forensic audit commissioned by Defendant Booker on behalf of the Town of Atlantic Beach, he would have reported to the State Ethics Commission that the transactions containing the Plaintiff's signature on her own checks was a matter of council policy and not an ethics violation.

362.    Defendants Hayden and Bagnall ignore the fact that the Plaintiff sought to change check signing policy by changing the town's Rules and Procedure Ordinance

and check signing resolution to provide alternatives to check signing when the check was payable to a check signer. The record shows that the Plaintiff nominated other council members for check signing duties and cast her vote for them. None of the Council's other nominated council members would accept the responsibility for check signing. None of the council members nominated Defendant Evans or Pierce. The records show that Mayor Retha Pierce and Defendants Evans and Taylor prevented the Rules and Procedure ordinance from being placed on the agenda in 2011 and 2012 which could have resolved the issue of council members with check signing authority having to sign their own checks. The town council had several options and opportunities to change its check signing laws, policies and procedures. The Plaintiff, as her sole solution provided Blanton with her signature stamp.

363.    Such an acknowledgement of facts by Defendants Bagnall and Hayden would not support the greater goal of the harassment campaign against the Plaintiff. So confident was Defendant Evans of Defendant Hayden's ability to deliver a verdict against the Plaintiff he notified the judge in the Horry County Circuit Court requesting that he delay scheduling the hearing involving the Plaintiff until after the State Ethics Commission hearing.

364.    Defendant Evans regularly used threats of ethics charges against the Plaintiff and Councilwoman Price to try and prevent them from voting on issues before the town council where there was no conflict of interest for either of them. It was simply his strategy of intimidation to affect the outcome of each vote. Defendant Evans did this with the confidence that he had the support of Defendant Hayden.

365.    Defendant Hayden has failed to apply the same laws and standards when addressing complaints filed against Defendant Evans. The Plaintiff filed complaints against Defendants Evans, Taylor, and Williams in 2008 and as a member of the town council in 2012. The council voted on filing the complaint and presented it to the State Ethics Commission in a written resolution. According to the State Ethics Commission they have no record of complaints filed by the Plaintiff against any of the Defendants. Contrarily, Defendant Hayden allegedly found probable cause to bring ethics violations against the Plaintiff and Rev. Windy Price eight times in the two years and four months they served on the Atlantic Beach town council. He

participated in efforts to try and strip them of their voting rights and right to hold office in 2013 when the State Ethics Commission provided envelopes with U.S. Postal Service labels to support Evans' claim that the Plaintiff did not live in Atlantic Beach, a tactic that was also used with letters sent to the Plaintiff by the South Carolina Supreme Court during the election appeal process.

366.    The Plaintiff's scheduled hearing before the State Ethics Commission was January 15, 2014.  On December 31, 2013, the Plaintiff notified Cathy Hazelwood that she would be representing herself since her attorney is a witness in the case and asked for an open hearing.  The Plaintiff made an appointment to review the Commission's file on May 15, 2014.  On April 25, 2014, Cathy Hazelwood, attorney for the State Ethics Commission, informed the Plaintiff that "the Governor has seated an all new commission and they will not have hearing experience. Will re-notice you. Probably in November."  The Plaintiff's hearing date was changed from May 21, 2014 to November 19, 2014.  The Plaintiff requested an open hearing again on January 7, 2014.  In response to a citizen request for information about the Plaintiff's hearing Hazelwood responded that the Plaintiff's hearing is closed.

367.    Defendants Hayden, Bagnall and the State Ethics Commission have reached the pinnacle of their aggressive harassment campaign toward the Plaintiff disguised as a hearing on November 19, 2014.  The hearing is an attempt to use the State Ethics Commission to over-ride the Horry County Circuit Court's decision in favor of the Plaintiff that requires the town of Atlantic Beach to pay the settlement agreement. The Plaintiff is demanded to defend herself against these false charges.

368.    Defendant Bagnall's investigation was less than thorough and beyond biased. The issue is not an alleged "loophole" or ethics violation but defendants that know no boundaries and lack respect for jurisdiction.  Defendant Hayden has abused his authority and embroiled the State Ethics Commission in matters that originated as personal disagreements between former spouses, friends, and political adversaries.

369.    The Plaintiff's attorney has been cast in the role of witness and the Plaintiff has requested an open hearing to prevent and at best limit Defendant Hayden's miscommunication to the public as he did in Morris' 2009 article and subsequent news reports.   Defendant Hayden is blinded by his self-proclaimed vendetta against

the Plaintiff and his allegiance to his co-conspirators.  He used the State Ethics Commission in a manner and for a purpose unintended by the State legislature which violates the laws and rights of citizens in their capacity as public officials.

370.    Most people that make the decision to commit their lives to public service understand they must be thick-skinned beyond the average citizen and willing to accept a level of scrutiny and tolerance for character assassination that rises to the level of what is defined as the New York Times standard.  Most people involved in politics respect and understand the role of those appointed and hired to monitor the conduct and behavior of public officials.  It is the abuse of power coupled with abusive tactics and the targeting of individuals as Defendant Hayden did with the Plaintiff that is unacceptable and unlawful.   Defendant Hayden operated outside of the scope of his job when he offered his personal opinion in contrast to the findings of the State Ethics Commission and their 2004 ruling in favor of the Plaintiff.  He knew that in his official capacity he was telegraphing the message that the Plaintiff was guilty despite the Commission's findings and he did so in cooperation directly and indirectly with Defendant Gerald Montgomery, Defendant Williams, Defendant Evans, and his other South Carolina co-conspirators. The conduct of Defendants Hayden and Bagnall has undermined the authority of the State Ethics Commission and trivialized its role as enforcer of state ethics laws.

371.    The Plaintiff won the November 5, 2013 town council election but voluntarily dismissed her appeal with prejudice in the Horry County Circuit Court in April 2014 when she calculated the extremes to which the Defendants had previously gone to prevent her from holding office and the cost to her to fight them.   Defendants Evans, Isom, Taylor, and Booker changed the town's election date without changing the town's ordinance that would have allowed them to change the election date, appointed a new municipal election commission to conduct the illegal election, and announced their candidates as winners of their November 12, 2013 election.

372.    The Plaintiff attended a public meeting at Atlantic Beach Community Center to hear the Governor address the Atlantic Beach town council.  While giving an interview to the media about her impressions of the meeting, she was interrupted by

Defendant Evans' sister who chided her about not being seating on the town council and finished with "we're not done yet; we're going to run you out of this town."

373.    This illegal conduct to this degree for this sustained period should not be tolerated by state or federal law enforcement in any subdivision of the State of South Carolina. The issues of civil rights violations raised herein are supported by facts as are the issues of criminal misconduct which warrant consideration and investigation by the appropriate authorities so charged with the responsibility of protecting the public.

374.    The Defendants herein did knowingly and willfully combine, conspire, confederate, and agree with others to commit certain offenses to wit:

a.    executed and attempted to execute a scheme to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises by utilizing the U.S. mail and private and commercial interstate carriers, for the purpose of executing such scheme and artifice in violation of Title 18, U.S. Code Section 1341; and

b.    executed and attempted to execute a scheme to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, by transmitting and causing to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, visual pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, U.S. Code Section 1343.

c.    forged and falsified signatures on mortgage-related documents prepared by Rufus Farrior and Defendants Mark Randolph and Armina Swittenberg and filed in Register of Deeds offices in North Carolina.

d.    allowed others, unauthorized, to sign, and to have documents notarized as if the actual authorized signer had executed the documents; and

e.    unauthorized signing and notarization practices to generate greater profit and make more money as a borrower, mortgage brokers, lenders, realtors, appraisers, and insurers; and

f.    had attorneys file false documents delivered them through the mail or by electronic methods with local county Register of Deeds offices in North Carolina and South Carolina.  Many of these documents, particularly mortgage assignments

and lost note or assignment affidavits were later relied upon in court proceedings, including property foreclosures and matters of equitable distribution in divorce court. Defendant Gerald Montgomery knew that these property recorders, as well as those who received the documents such as courts, title insurers, and credit reporting agencies relied on these documents as genuine; and

g.    took various steps to conceal their actions from detection by the Plaintiff, law enforcement authorities, the Internal Revenue Service and others. The Defendants took advantage of the Plaintiff for personal gain and contributed to her economic hardship.

## CAUSES OF ACTION
## FOR A FIRST CAUSE OF ACTION
### (Violation of False Identification Crime Control Act of 1982)
### 18 USC §§ 1028, 1738

375.    Plaintiffs herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

376.    The Defendants Gerald Montgomery, Stanley Montgomery, JoAnn Cheek, James Penniegraft, Oasis Mortgage, Mark Randolph, Armina Swittenberg, Jennifer Dalton Watson, did violate 18 USC §§ 1028, 1738 when they conspired to and did use the Plaintiff's identity to commit felony crimes, including mortgage loan fraud, bank fraud, wire fraud, and mail fraud. The Plaintiff's Driver's license, signature, forged signature, tax returns and bank account information was used to refinance mortgages on properties she owned jointly with Defendant Gerald Montgomery.

377.    The Plaintiff's joint bank accounts and income tax returns were used by Defendants Gerald Montgomery, JoAnn Cheek, James Penniegraft, Stanley Montgomery and Armina Swittenberg to acquire new loans. Defendant Randolph aided and abetted Defendants Gerald Montgomery in concealing information about the mortgage loan transactions from the Plaintiff including withholding closing information and funds obtained from the refinanced properties and refusing to provide files for the mortgage loan and bank transactions.

378.    The Identity Theft Enforcement & Restitution Act of 2008 amends 18

U.S.C. §3663 (b) to make it clear that restitution orders for identity theft cases may include an amount equal to the value of the victim's time spent remediating the actual or intended harm of the identity theft. The new law allows federal courts to prosecute when the criminal and the victim live in the same state. Under previous law, federal courts only had jurisdiction if the thief uses interstate communication to access the victim's Personal Identifying Information (PII).

## FOR A SECOND CAUSE OF ACTION

### (Fraud)

379.    Plaintiffs herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

380.    Defendants Gerald Montgomery, Stanley Montgomery, Mark Randolph, Armina Swittenberg, JoAnn Cheek, James Penniegraft, First Citizens Bank, Argent Mortgage, Option One Mortgage, Attorney's Title Company, Commonwealth Land Title Insurance Company, Investors Title Insurance Company, Southeastern Title Agency, and Stewart Title Company either directly or through an agent or servant made representations to the Plaintiff concerning the aforementioned properties and that these representations were false.

381.    The Defendants either knew or should have known by an exercise of any diligence that they were false. These representations were material to the aforementioned mortgage loans, insurances, tax returns, escrow accounts and balances due.

382.    That it was the Defendants' intention that the Plaintiff rely upon these representations. That at the time the Plaintiff was ignorant of its falsity, and did rely thereon to obtain insurance, maintain escrow accounts, and file tax returns and upon finding out that the information was false expended valuable time and resources trying to remedy the situation.

383.    That as a direct result and consequence of the Defendants' fraud, the Plaintiff suffered extreme emotional distress and anguish, loss of income, the quality of her life was diminished, and she expended valuable time and resources to discover and demonstrate the truth.

## FOR A THIRD CAUSE OF ACTION

**(Breach of Contract, Accompanied by Fraudulent Acts)**

384.    Plaintiffs herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

385.    That the Plaintiff and Defendant Gerald Montgomery, as a married couple, entered into legal mortgage loans on rental properties wherein they were jointly responsible for the mortgage,  property insurance, property taxes, maintenance and other expenses. Defendant Gerald Montgomery, thereafter stepped into the shoes of the Plaintiff, taking over her interest in the properties and mortgage loan contracts with the assistance of Defendants Stanley Montgomery, James Penniegraft, JoAnn Cheek, Mark Randolph, and Jennifer Dalton Watson and using them for purposes for which they were not intended.

386.    That in violation of that agreement, Defendants refinanced and cashed out on the existing mortgage loans incurring bank fees, appraisal fees, realtor's commissions, and other expenses and accompanying the breach of the aforesaid agreement and contract, the Defendant committed fraudulent acts as heretofore set forth.

387.    That as a direct result and consequence of the Defendants' breach of contract and accompanying fraudulent acts, Plaintiffs suffered extreme emotional distress and anguish the quality of her life was diminished, and she expended valuable time and resources to discover and demonstrate the truth. Because of the fraud accompanying this breach Plaintiffs are entitled to recover punitive as well as actual damages and to have the mortgage contracts rescinded.

## FOR A FOURTH CAUSE OF ACTION

### (Defamation of Credit)

388.    The Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

389.    That Defendants did publish to third parties the false allegations that Plaintiff's mortgage loan accounts with Defendants were delinquent.

390.    That as a direct result and consequence of the Defendants' willful defamation, the Plaintiff suffered extreme emotional distress and anguish, lost income, and incurred damage to her credit and reputation.

## FOR A FIFTH CAUSE OF ACTION

### (Slander of Title)

391.    Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

392.    That Defendant did disparage the Plaintiff's good title, falsely and maliciously questioning and attacking her title to the aforesaid property and denying her rights to use and dominion thereover.

393.    That as a direct result and consequence of the Defendants' willful defamation, Plaintiff suffered extreme emotional distress and anguish, loss of income, and damage to her credit and reputation.

## FOR A SIXTH CAUSE OF ACTION

### (Trespass to Try Title)

394.    Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

395.    That Defendants did disparage and diminish the Plaintiff's title and right to the aforesaid property.

396.    That as a direct result and consequence of the Defendants' trespass, Plaintiff was denied the full use and enjoyment of her property aforesaid, suffered extreme emotional distress and anguish and damage to her credit and reputation.

## FOR AN SEVENTH CAUSE OF ACTION

### (Unfair Trade Practices)

### South Carolina Code of Laws § 39-5-140

397.    Plaintiffs herein repeat and reiterate each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.  Defendants committed unfair, deceptive and unlawful acts, and practices violating § 39-5-20, of the South Carolina Code of Laws in each of the following particulars:

      a.    In falsely billing, Plaintiff for money, which was not owed;

      b.    In harassing the Plaintiff by mail, telephone and through visits by agents attempting to extort moneys;

      c.    In attempting to extort moneys to which they were not entitled;

      d.    In, upon information and belief, falsely reporting to third parties that Plaintiff owed them money;

      e.    In threatening to foreclose on properties co-owned by the Plaintiff and or in which the Plaintiff had a marital interest;

      f.    In foreclosing on properties co-owned by the Plaintiff and or in which the Plaintiff had a marital interest;

      g.    In threatening to defame, the plaintiff's credit;

      h.    In defaming the plaintiff's credit;

      i.    In failing to acknowledge or recognize that the plaintiff had property interests, even after notice;

      j.    In refusing to acknowledge Plaintiff's rights;

398.    That as a direct result and consequence of the Defendants willful, fraudulent, deceptive and misleading actions, the Plaintiff suffered extreme emotional distress and anguish and damage to her credit and reputation.  Plaintiff is entitled to treble her actual damages pursuant to § 39-5-140 S.C. Code of Laws.

## FOR AN EIGHTH CAUSE OF ACTION

### Violation of Federal Trade Commission Act 15 USC 45 § 5

399.    The acts and practices of the state chartered banks and mortgage lending

institutions violated both section 5 of the FTC Act and other federal and state laws which adversely affected the Plaintiff. The practice of not allowing the Plaintiff to access information about the notes signed using her name is an unfair trade practice which caused substantial injury to her. By forcing the Plaintiff to seek this information through subpoenas and then failing to respond to the subpoenas created a tacit denial of information to which the plaintiff had a right. Once her personal identifying information was stolen and used by officers of the court, i.e. a notary, and attorneys, the Plaintiff did not have the ability to avoid the acquisition of property in her name or the foreclosures. The initial act of stealing the Plaintiff's personal identifying information, in this case, her driver's license, set up a chain reaction of unfair and deceptive practices at the onset of the home-buying and mortgage lending process from the false information on the initial loan applications, through underwriting and finally closing and recording of legal documents by licensed attorneys.

400.    The professional bankers, mortgage brokers, realtors, attorneys involved conspiring with the plaintiff's former husband to conceal the fraudulent mortgages buried not only the mortgage loan documents but any consumer protections afforded an ordinary consumer.

401.    The title companies, banks, mortgage lenders, brokers, and attorneys failed to oversee their employees adherence to the laws, bank policies, title insurance policies and procedures and focused on denying the Plaintiff's access to information that would have enabled her to make informed decisions.

402.    The banks and lenders did not disclose to the plaintiff initial terms and conditions and subsequent changes in notes, terms, interest rates, etc. After the initial illegal use of the Plaintiff's identifying information to obtain the loans, the Plaintiff was relegated to the position assigned to her by the Defendants that had pre-determined little to no decision-making authority for the loans past, present, or future.

## **FOR A NINTH CAUSE OF ACTION**

### **(Unfair Debt Collection Practices)**

### **15 USC § 45**

403.    Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

404.    Defendants Argent Mortgage and Option One are upon information and belief, a debt collector, collecting debts for others.

405.    Those Defendants engaged in communications with the Plaintiff that was abusive, false, misleading and unfair in each of the following  particulars:

    a.  In falsely billing, plaintiffs for money, which was not owed;

    b.  In harassing the plaintiff by mail, telephone and through visits by agents attempting to extort moneys;

    c.  In attempting to extort moneys to which they were not entitled;

    d.   Upon information and belief, falsely reporting to third parties, that the Plaintiff owed them money;

    e.  In threatening to foreclose on properties co-owned by the Plaintiff and or in which the Plaintiff had a marital interest;

    f.  In threatening to defame, the Plaintiffs' credit;

    g.  In defaming the Plaintiffs' credit;

406.    That as a direct result and consequence of the Defendants' harassing and unfair acts the Plaintiff suffered extreme emotional distress and anguish and damage to her credit and reputation, statutory damages and costs and legal fees.

## FOR A TENTH CAUSE OF ACTION

### (Violation of First Amendment Free Speech)
### (42 USC § 1983)

407.    Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

408.    The aforementioned acts, conduct, omissions, policies and practices by the Defendants did cause the deprivation of the Plaintiff's property and right to speak.  Such was done without legal justification or probable cause, in violation of her rights under the First and Fourteenth Amendments to the U.S. Constitution to be free from retaliation for the exercise of her free speech and criticism of Defendants' lies, corruption and tyranny.

409.    The Defendants with direct involvement in the theft of her personal identifying information tried to prevent her from finding out about their involvement in the use of that information to commit crimes and when she did find out they used a variety of bullying

tactics to threaten, intimidate, and coerce silence that did violate the Plaintiff's rights under the first amendment to speak freely and access information about mortgages acquired in her name and those acquired indirectly that forced spousal responsibility upon her.

410. The defendants affiliated with the government of the town of Atlantic Beach conspired with the aforementioned defendants to silence the plaintiff's criticism of them as public officials for failure to comply with state laws in the handling of the town of Atlantic Beach's budget and audits, mortgage loan case, and elections.

411. The Plaintiff was equally critical and vocal about Defendant Hayden's role in using the Commission as a weapon against public officials inconsistent with the purpose and intent of the Ethics Reform Act.

412. The public officials in local and state government used their official positions to silence the plaintiff separately and together. The gag order in the ethics law during the investigation phase prevented the Plaintiff from speaking out about the town's minutes that were being altered and fabricated to manufacture non-existent evidence for a probable cause finding.

413. Together the Defendants stripped the Plaintiff of her free speech rights when they submitted documents using her personal identifying information to banks, lending institutions, the IRS, and others without her knowledge or authorization and used it in the commission of crimes, and when they conspired together to silence her using their respective offices.

414. Defendant Gerald Montgomery caused the result of the crimes committed to be placed on income tax returns and other legal documents including financial affidavits for the Florida divorce court.

415. That as a direct result and consequence of the aforestated actions of the Defendants, Plaintiff was intimidated, terrorized, and restrained from the exercise of her right to speech and to criticize the government and suffered intense distress, public humiliation and other injury, incurred attorney's fees, damage to her reputation and loss of income.

416. The Fourth Circuit has held that "[t]he First Amendment guarantees an individual the right to speak freely including the right to criticize the government and government officials," and that "[f]ear of retaliation may chill an individual's speech, and, therefore, permit the government to produce a result which [it] could not command directly." Trulock v. Freech, 275 F. 3d 391, 404 (4th Cir. 2001). The Fourth Circuit has added that "[t]o

4:14-cv-04462-RMG-KDW    Date Filed 11/18/14    Entry Number 1-1    Page 98 of 107

establish a First Amendment retaliation claim, a plaintiff must prove three elements: (i) that [her] speech was protected; (ii) that the defendant's allegedly retaliatory action adversely affected [her] constitutionally protected speech; and (iii) that a causal relationship existed between [her] speech and the defendant's retaliatory action." Id.

## FOR AN ELEVENTH CAUSE OF ACTION

### (Violation of Fourth Amendment Due Process)

### (42 USC § 1983)

417. Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

418. The aforementioned acts, conduct, omissions, policies and practices by the Defendants did cause the restriction of the Plaintiff's liberty and freedom of movement causing her to appear in court and before other tribunals and have to defend herself on charges involving the condemnation of property in the town of Atlantic Beach in which she had marital interests and was ordered by the Florida Divorce Court to manage, election issues before Horry County Courts and the South Carolina Supreme Court, and alleged violations of state ethics laws before the S.C. State Ethics Commission. Such was done without legal justification or probable cause, in violation of her rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from seizure of her person without probable cause.

419. That as a direct result and consequence of the aforestated actions of the Defendants, Plaintiff was intimidated, terrorized, and restrained from the exercise of her right to liberty and freedom of movement and suffered intense distress, public humiliation and other injury, incurred defense costs, damage to her reputation and loss of income.

## FOR A TWELFTH CAUSE OF ACTION

### Deprivation of Property

### (42 USC § 1983)

420. Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

421.    The aforementioned acts, conduct, omissions, policies and practices by the Defendants did cause the Plaintiff's deprivation of property under the Constitution.  In the complaint, the Plaintiff asserts that "Defendants violated Plaintiff's rights under the Fifth amendment by depriving the Plaintiff of property without due process, destroying the value of the Plaintiff's mortgages, leaseholds, condemning property, and thereafter failing to provide just compensation.

## FOR A THIRTEENTH CAUSE OF ACTION

### Violations of 42 U.S.C. §1983

### Bills of Attainder

422.    This cause of action is for "Bills of Attainder" pursuant to 42 U.S.C. §1983.  In support of this claim, the Plaintiff asserts generally that "Defendants did pass laws aimed directly at Plaintiff and allowed their employee Defendant Booker to enforce the newly passed law and to direct police officers to misapply state laws and town ordinances to prevent the Plaintiff from accessing her property with contractors to renovate the property.

423.    Earlier in "Factual allegations portion of the complaint, the plaintiff asserts that after the plaintiff had utility services turned on in the property at 413 30[th] Avenue South, Defendant Booker directed Santee Cooper, the electric service provider to disconnect the service.  Defendant Booker submitted an ordinance to the town council composed of Defendants Evans, Taylor, and Isom who passed an ordinance requiring Town approval before utility services could be provided to a property.  The defendants held a meeting of the town's Property Maintenance Board and had the property condemned to meet the terms and conditions of their newly passed ordinance.   The Plaintiff was served notice of the Property Maintenance Board hearing to address the property on the day after the hearing was held and the decision to condemn the property was made.  This method of conducting such a hearing is in violation of the town's ordinances and the Plaintiff's due process rights.  After the property went into foreclosure and was purchased by a new owner, the new owner was told the property was not condemned. A bill of attainder has been described by the United States Supreme Court as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."

424.    Defendant Booker submitted a resolution or ordinance to Defendants Evans, Isom, and Taylor to have Defendant Vernessa Pertell, a business partner and alleged employee of Defendant Gerald Montgomery appointed as a municipal judge in the town of Atlantic Beach.  The town had a municipal judge in the town's only paid position for a municipal judge.  To give Defendant Pertell the ability to harm the Plaintiff and her associates; she was the new position was as a "volunteer" judge.  In the capacity of volunteer judge Defendant Pertell signed warrants against the Plaintiff's associates and had them arrested on bogus charges that were later dropped in legal hearings before county magistrates and circuit court judges.

## FOR A FOURTEENTH CAUSE OF ACTION

### (Conspiracy)

425.    Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

426.    That Defendants with third parties conspired together and acted in concert to commit illegal acts and/or to commit legal acts by illegal means to harm the Plaintiff, and committed acts in furtherance of this conspiracy.   South Carolina courts have held that "[t] the tort of civil conspiracy has three elements: (1)  a combination of two or more persons, (2)  for the purpose of injuring the plaintiff, and (3) causing plaintiff special damage."  Hackworth v. Greywood at Hammett, LLC, 682 S.E. 2d 871, 874 (2009) (citing Vaught v. Waites, 387 S.E. 2d 91, 95 (Ct. App. 1989)).  The South Carolina Supreme Court has further held that "a [a] claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than re-allege other claims within the complaint," and that "because the quiddity of a civil conspiracy claim is the special damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other cause of action."

427.    The Fourth Circuit has noted that "the due process clause of the Fifth Amendment applies to action by the federal government," and that a due process action against a state entity "must be grounded in the Fourteenth Amendment's due process clause."  Quest Communications Corp. v. City of Greensboro, 440 F. Supp. 2d 480, 494 (M. D. N.C. 2006).  To state a claim for relief, the Plaintiff "must set forth (1) a cognizable property interest, rooted in

state law; and (2) an arbitrary and capricious deprivation of that right." Id. At 493-94 (citing Scott v. Greenville County, 716 F. 2d 1409, 1418 (4th Cir. 1983)).

428.     As a direct result and consequence of the aforestated actions of the Defendants, the Plaintiff has suffered special damages, incurring legal expenses, costs and fees, have suffered injury to her reputation and has experienced emotional distress and outrage, together with loss of property and income.

## FOR A FIFTEENTH CAUSE OF ACTION

### Violations of 42 U.S.C. §1985

### Preventing an Officer from Holding Office

429.     Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

430.     The Plaintiff won a seat as a write-in candidate on the town council of Atlantic Beach in 2009.  Defendants Gerald Montgomery, Jake Evans, Josephine Isom, Charlene Taylor, William Booker, Lynda Booker, and Herbert Hayden used their positions on the town council, Municipal Election Commission, as town administrator, and director of the State Ethics Commission to first prevent the Plaintiff from becoming a resident of the town, prevent her from holding office, and then conspired to remove her from office.

## FOR A SIXTEENTH CAUSE OF ACTION

### Violations of 42 U.S.C. §1985

### Obstruction of Justice

431.     The Defendants conspired for the purpose of impeding, hindering, obstructing and defeating the due course of justice in North Carolina, South Carolina and Florida with the intent to deny the Plaintiff the equal protection of the laws.

## FOR A SEVENTEENTH CAUSE OF ACTION

### Violations of 42 U.S.C. §1985

### Depriving Person of Rights

432.     This cause of action is for "Depriving Persons of Rights" pursuant to 42 U.S.C §1985.  In support of the fourth cause of action, the Plaintiff alleges generally that "the Defendants conspired for the purpose of depriving the Plaintiff of the equal protection of the laws.

## FOR AN EIGHTEENTH CAUSE OF ACTION

### Violation of 42 U.S.C §1986

### Deprivation of Rights

433.     The Plaintiff's eighteenth cause of action is for deprivation of rights pursuant to 42 U.S.C. §1986.   Section 1986, in relevant part, provides a cause of action against: [e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, …. Shall be liable to the party injured…for all damages cause by such wrongful act.  In addition, "[a] cause of action based upon §1986 is dependent upon the existence of a claim under §1985."  Trerice v. Summons, 755 F. 2d 1081, 1085 (4th Cir. 1985).

## FOR A NINETEENTH CAUSE OF ACTION

### Abuse of Process, Malicious Prosecution, § 1983

434.     Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim.

435.     That Defendant Herbert Hayden did cause process to be issued and pursued against Plaintiff for alleged late filing of Statements of Economic Interests, where no such delinquency existed and not for the purposes intended but for ulterior purposes, including revenge against Plaintiff.

436.     That Defendants Booker, Evans, Taylor, and Isom did cause process to be issued and pursued against the Plaintiff when they condemned property at 413 30th Avenue without serving notice of hearing to the Plaintiff prior to the hearing.

437.     That Defendant Gerald Montgomery did cause contempt charges to be issued

against the Plaintiff in the Florida Divorce court falsely alleging failure to provide him with information about mortgage loans that had already been provided to him and/or information to which he had access.

438.    That Defendants Gerald Montgomery, Stanley Montgomery, James Penniegraft, JoAnn Cheek, Mark Randolph, Armina Swittenberg, and Jennifer Dalton Watson did in concert with employees of Defendant banks, mortgage companies, and title insurance companies did cause process to be issued and pursued that resulted in Defendant Gerald Montgomery acquiring title to properties with mortgage loans, insurance, and maintenance costs for which the Plaintiff was made responsible.

439.    That Defendant Gerald Montgomery did cause foreclosure on thirteen properties co-owned with the Plaintiff and/or in which the Plaintiff had marital interests.  Eight of the thirteen properties (1612 Lincoln Street, 1622 Pichard Street, 1826 Bothwell Street, 3712 Nash Street, 1624 Pichard Street, 2206 Tuscaloosa Street, 2109 Windsor Street, and Windsor Street), after the foreclosure sales are recorded in Guilford County as "entire amount of the secured obligation was not satisfied."  The Bank of American refinance on the Martin Luther King, Jr. Drive Apartments ended with a judgment against the Plaintiff.  Bank of America sold the note to Equity Resource Partners who have written to the Plaintiff and her attorney that they will not pursue collection on the judgment but refuse to submit legal documents to the Court to dismiss the judgment.  Three of the properties (1602 Pichard Street, 2207 E. Florida Street, and 1714 Pichard Street) were recorded in Guilford County, North Carolina without status of the secured obligation.  The only property recorded in Guilford County as secured obligation satisfied is #1 Pine Ridge Court.

440.    The essential elements of abuse of process are an ulterior purpose and a willful act in the use of the process." Hainer v. Am. Med. Intern., Inc., 328 S.C. 128, 136, 492 S.E.2d 103, 107 (1997) (citing Huggins v. Winn-Dixie Greenville, Inc., 249 S.C. 206, 153 S.E.2d 693 (1967)).  The abuse of process tort provides a remedy for one damaged by another's *perversion of a legal procedure for a purpose not intended by the procedure*. Food Lion,Inc. v. United Food Commercial Workers Int'l Union, 351 S.C. 65, 69, 567 S.E.2d 251,253 (Ct. App. 2002) (emphasis added). Defendants here had an animosity toward Plaintiff and a desire to silence her. The ulterior purpose was to coerce her silence, restrain her criticism, drive the Plaintiff out of Atlantic Beach and prevent her from taking the seat on the town council and operating the

restaurant. "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself." Hainer, 328S.C. at 136, 492 S.E.2d at 107.

441.    The Defendants have been held by the S.C. Supreme Court to have been attempting to coerce the Plaintiff out of Atlantic Beach so that she would not take her seat on counsel. This is certainly not a proper purpose for the use of the process.  Defendants here had an animosity toward Plaintiff and a desire to silence her. The ulterior purpose was to coerce her silence, restrain her criticism, drive her and her associates out of Atlantic Beach or from having any means of a peaceful life. "The improper purpose usually takes the form of coercion to obtain a collateral advantage."  Hainer, 328S.C. at 136, 492 S.E.2d at 107.  The Defendants have been held by the S.C. Supreme Court to have been attempting to coerce the Plaintiff out of Atlantic Beach so that she could not run for council and could not use the apartments or restaurant property to establish a viable means of financial support for herself.  This is certainly not a proper purpose for the use of the process.

442.    As a direct result and consequence of the aforestated actions of the Defendant, the Plaintiff has incurred legal expenses, costs and fees, has suffered injury to her reputation and has experienced emotional distress and outrage.


## FOR A TWENTIETH CAUSE OF ACTION

### (Equitable Relief)

443.    Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth herein verbatim

444.    That because of the fraudulent, material and recurrent  manner of this breach, the Plaintiff is entitled to terminate the contract, note and mortgage, and to have an order entered that the same should be marked terminated and satisfied, relieving the Plaintiff of any further obligation there under.

## CONCLUSION

445.    The Defendants share a common bond of mortgage loan, bank fraud, and a dislike for the Plaintiff—a person who simply stumbled upon their illegal activity.  They shared a common belief that the only way to save themselves was to force the Plaintiff into silence or submission and when those tactics failed; they enlisted people to help them discredit her.  Their desire to continue their illegal activity without interference and with support from law enforcement and public officials sufficiently binds them in a conspiracy to silence her that has violated her rights.  The Plaintiff has suffered greatly at the hands of the Defendants at times collectively and individually.  Their actions have left an indelible mark on her life.  Her credit has been severely damaged and the legal expenses incurred defending herself in a protracted divorce case and against other manufactured charges have been astronomical and resulted in bankruptcy.  Defendant Gerald Montgomery's taking of her driver's license and use of it without her permission violated an agreement between the two of them as a married couple and as business partners.  He has invested heavily in marketing himself as a self-made millionaire trying to protect his assets from a greedy and vindictive former spouse; handsomely rewarded his conspirators, setting up new businesses, and living comfortably in a mortgage-free home that cost over $841,000 while his fraudulent mortgages costs the Plaintiff, their business partners, friends and the American public.  He altered the lives of people whose choices were extremely limited—the tenants.  Each foreclosure displaced families, mostly single mothers and their children or senior citizens, some of whom had been in their homes for over fifteen years. The opportunities afforded him were beyond his reach in the normal progression of his work life. People who trusted and believed in him gave him a chance to be a businessman and partner that generated legitimate assets in excess of $11 million dollars in 2006 when the Plaintiff filed for divorce.  His greed and arrogance compelled him to respond to their trust with deception, thievery, and violence.

446.    The last round of subpoenas issued in 2012 by the Plaintiff's divorce attorney revealed bank transactions handled directly by Defendant Gerald Montgomery with the help of bank employees that allowed him to move money that belonged to both he and the Plaintiff,

obtain loans, and participate in other fraudulent banking transactions. The multi-million dollar transactions based on false information are not simply clever strategies to avoid the Florida court's Administrative Order and equitable distribution of marital assets, but white collar bank robberies by a person who has gone undetected and protected while others served time in prison, were censured, disbarred, lost jobs and businesses.

447.   Defendant Gerald Montgomery and his co-conspirators published and/or communicated falsehoods about the Plaintiff to third parties with the full knowledge and understanding that it would likely result in inducing others not to deal with the Plaintiff and indeed these falsehoods played a material and substantial part in inducing others not to work with the Plaintiff. Extreme damages were caused to the Plaintiff as a result of their published falsehoods and other collaborative actions.

448.   The Plaintiff has genuine concerns about whether or not there is continued use of her identifying information without her knowledge and the ongoing harassment she endures as well as the harassment of her friends and associates. For the most part she has waited patiently working through the final stages of the divorce process through the Florida Court and addressing each issue raised by the Defendant Gerald Montgomery as well as the issues raised by the South Carolina Defendants in the county and state courts and other tribunals. The issues in this case far exceed "normal" divorce-related issues and political rivalries. The Defendants knowingly used their positions to violate the Plaintiff's civil and human rights.

449.   Wherefore Plaintiff seeks relief as accorded by the applicable statutes, including, but not limited to:

    a.  Statutory Compensatory damages for each separate violation according to proof; and

    b.  Exemplary damages for each separate violation based on the net worth of the Defendants on their own behalf, and on behalf of the co-defendants; and

    c.  Declaratory relief, including permanent injunctive relief, prohibiting these Defendants, or any of their agents or assigns, from any further harassment and breaches of the statutes; and

d.  Punitive damages; and

e.  Reasonable attorney's fees and court costs according to proof; and

f.  Such other and further relief as the court deems just and proper.

### JURY TRIAL DEMAND

Respectfully submitted,

Carolyn D. Cole, Pro Se
1009 32nd Avenue South
Atlantic Beach, South Carolina 29582
407-259-7321
ccm2playw@aol.com